Morris G. BARNES and The City of Dover, a Municipal corporation of the State of Delaware, Defendants Below, Appellants,

v.

Alice A. TOPPIN and James R. Toppin, Plaintiffs Below, Appellees.

Supreme Court of Delaware.

Submitted: March 29, 1984.

Decided: Sept. 19, 1984.

Wayne N. Elliott (argued), Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for appellants.

Leonard L. Williams (argued), and Kester I.H. Crosse, Wilmington, for appellees.

Before McNEILLY, MOORE and CHRISTIE, JJ.

CHRISTIE, Justice:

This is an appeal from a judgment in Superior Court, based on a jury verdict granting an award of $350,000 to plaintiffs as a result of a two-car auto accident. We find no reversible error and affirm.

This case was tried three times in the Superior Court. At the first trial there was a verdict for the defendants. However, after a post-trial hearing as to the racial bias of the jury, the trial court ordered a new trial.

The case was tried again on May 3, 1982, and that trial resulted in a hung jury.

On November 29, 1982 there was a third trial which resulted in the verdict for plaintiffs. After that verdict, defendants-appellants moved for a judgment notwithstanding the verdict or, in the alternative, for a new trial. This motion was denied by the trial court.

Morris Barnes and the City of Dover, defendants-appellants, have appealed. They seek to overturn (1) the Superior Court order dated October 14, 1981 granting the plaintiffs a new trial after the first trial, (2) the jury verdict in the third trial, in favor of the Toppins, and (3) the order dated April 8, 1983 denying defendants-appellants' post-trial motions.

The facts as revealed at the third trial may be summarized as follows:

On December 22, 1976 at approximately 11:15 p.m., vehicles driven by Alice Toppin (a plaintiff in Superior Court) and Police Officer Morris Barnes (a defendant in Superior Court) collided within the intersection of Walker and Saulsbury Roads, in Dover. This collision caused the death of one passenger in the Toppin vehicle and seriously injured Alice Toppin and her other passenger.[1] At that time, Saulsbury Road was a two-lane road with traffic proceeding north and south. Saulsbury Road had no traffic control signals. Walker Road was east and westbound and was controlled by stop signs for traffic proceeding in both directions. The speed limit on Saulsbury Road was 40 miles per hour.

Alice Toppin was returning home from work with two passengers in her vehicle. Mrs. Toppin testified that she proceeded west on Walker Road and came to a complete stop at the Saulsbury intersection, with the front of her vehicle resting behind the edge of the turn lane. She remained stopped for several seconds.

Morris Barnes was operating a Dover police vehicle within the course and scope of his employment. He testified that as he proceeded north on Saulsbury Road he observed the Toppin vehicle come to a stop, and that it remained stopped for approximately five seconds. As Barnes approached the intersection, he attempted to

---

1. The verdict of $350,000 was for Mrs. Toppin. The injured passenger and the estate of the passenger who was killed were not parties to this lawsuit.

get into position to pace a speeding pickup truck. In so doing, he traveled at speeds as high as 75 miles per hour. Barnes was aware that the area was semi-residential with some industrial traffic, and that the intersection was dangerous. He knew that he was exceeding the speed limit as he approached the intersection. Nevertheless, he reduced his speed very little and did not give an audible or visual signal. The police officer knew that the only evidence of his approach that could be seen by Alice Toppin on Walker Road were the headlights on his vehicle. He was aware that his conduct represented a threat to the person and property of the occupants of the stopped vehicle, and that the driver of that vehicle had no way of knowing that he was a police officer. His vehicle struck the Toppin vehicle at a speed of approximately 60 miles per hour while the Toppin vehicle was proceeding at 10 miles per hour.

Mrs. Toppin testified that she stopped her vehicle at a point on Walker Road, behind the turning lane or shoulder of Saulsbury Road, providing her with a view of traffic approaching from the south.[2] Mrs. Toppin looked to her left and right, and did not see any traffic proceeding in either direction on Saulsbury Road. She looked directly ahead on Walker Road, and saw a vehicle in the distance in front of her. She slowly proceeded to cross the intersection when her vehicle was struck by the Barnes vehicle. At impact, the front of her vehicle was several feet across the center line of Saulsbury Road. One witness testified that shortly after the accident Barnes told him, "I don't know where the hell she came from. I didn't even see them."

Mrs. Toppin testified that she never saw the Barnes vehicle prior to impact. Expert testimony proffered at trial suggested that, in terms of reasonable engineering probability, Mrs. Toppin would have seen the headlights of the Barnes vehicle at least

400 feet away. However, there was evidence presented by various sources, which revealed the existence of several impediments to one's view along Saulsbury Road. There was a house, a fence, and shrubs located 250 feet south of the intersection. In addition, several witnesses at the accident scene, together with expert witnesses for each party, testified that Saulsbury Road had a dip in elevation beginning 500–600 feet south of the intersection. This dip continued its descent several hundred feet past that point. The experts agreed that the structures along Saulsbury Road, in conjunction with the dip in elevation, could have impaired Mrs. Toppin's view of the approaching vehicle.

Mr. Merz, plaintiff's expert in accident reconstruction, testified that the speed of the Barnes vehicle was such that he would have traveled 600–700 feet while the Toppin vehicle covered only 30 feet. He stated that, considering the speed of the respective vehicles, once Mrs. Toppin entered the traveled portion of Saulsbury Road her reaction time may not have allowed her sufficient time to stop or to accelerate so as to get safely through the intersection.

As an alternate ground for recovery against the City of Dover, the plaintiffs alleged negligence on the part of the city for failing to properly train and supervise Officer Barnes, and for failing to enact rules and regulations governing the conduct of its police officers in emergency situations. The evidence showed that the City of Dover had not enacted a comprehensive set of rules or regulations governing a police officer's conduct in emergency situations.

In fact, there was evidence indicating that earlier that same day, Barnes had proceeded through the same intersection at 80 miles per hour and did not give an audible or visual signal. Despite the fact

2. Mrs. Schuh, the State Highway Engineer, produced a visibility chart which confirmed that Mrs. Toppin could have stopped an additional 15 feet behind her actual stopping point, and at that point she still would have been within the acceptable range of visibility to see approaching traffic on Saulsbury Road.

that such actions were in violation of departmental procedures, his supervisor did not reprimand Barnes.

One expert witness, a former police chief, testified that whenever a police officer approached and entered an intersection at speeds in excess of 20 miles per hour above the speed limit, he was obligated to give some notice of his approach to a citizen driver stopped for a stop sign at the intersection.

This witness also stated that it is very important for a police department to have written guidelines setting forth standards of conduct for police officers to follow in emergency situations.

## I

█ The first issue raised by the appellants stems from the contention that the trial judge abused his discretion when he granted plaintiffs' motion for a new trial after the first jury had returned a verdict for the defendants.

Appellants contend that the new trial was granted on a mere showing of a possibility that extrinsic material could have affected the verdict. They point out that the rule in Delaware is that a new trial is granted only where "actual bias" is shown, or to put it more precisely, the one seeking the new trial must show that the extraneous matter actually unfairly influenced the jury. *See Slate v. Halko*, Del.Super., 193 A.2d 817 (1963).

The difficulty with this argument is that, in view of D.R.E. § 606(b),[3] the court may not inquire as to the part "actual bias" played during deliberations, and so in cases

where actual bias played a part in the verdict, the proof thereof is likely to consist of circumstantial evidence.

After the first trial, the trial judge received a letter from a Mr. Goodhue, one of the jurors, which led him to suspect that racial bias played an improper role in the jury verdict. Thereafter, the trial judge held a hearing at which the juror's testimony was presented. In an opinion letter the trial judge stated:

The juror, Mr. Goodhue, who is a Vice President of Wilmington Trust Company, testified that prior to this case he had known only one of the jurors and that was from service on a previous trial, and that his reason for writing the letter was that he had been ashamed for not having caused the jury to be hung and because of the prejudice which certain jurors had demonstrated. He stated that one of the jurors, a woman, had observed at an early stage in the trial that she had been a juror on an earlier case which the attorney for plaintiff had conducted and that she did not know whether she could stand a two-week trial with him, and on another occasion she had said that she hated him and that she knew something about him but was not going to say anything. One juror had commented that the attorney for plaintiffs had a light or white wife. Another juror had made the comment "I guess we have to be color blind," but the witness did not know whether this was said in seriousness or not. He stated that another juror had talked about her work had been like police work and that she had a friend

3. *Rule 606. Competency of Juror as Witness.*
(a) *At the Trial.* A member of the jury may not testify as a witness before that jury in the trial of the case in which he is sitting as a juror. If he is called so to testify, the opposing party shall be afforded an opportunity to object out of the presence of the jury.
(b) *Inquiry into Validity of Verdict or Indictment.* Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind

or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the juror's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

who was a police officer. All of the above statements were made while the trial was under way and before deliberations commenced. He also stated that during the deliberations some jurors made remarks which indicated to him that they were motivated by racial prejudice.

\* \* \* \* \* \*

According to the testimony of Mr. Goodhue, the jurors' specific statements about which he testified were made during the course of the trial, before completion of the evidence, and at a time when the jurors had been instructed not to hold deliberative discussions until after summations by the attorneys and instructions from the Court. Therefore, the statements which are before the Court here were not a part of jury deliberations, and their disclosure does not violate Evidence Rule 606(b).

As this Court stated in *Styler v. State,* Del.Supr., 417 A.2d 948, 951 (1980): "Juror bias, of course, will not be tolerated in our judicial system."

We conclude that there was evidence before the trial judge from which he could, and did, find that extraneous matter, in the form of racial bias, probably played a role in the deliberations of the jury. We find this sufficient to justify the granting of a new trial.

Appellants also contend that the evidence of bias in the jury room, which moved the trial court to grant a new trial, amounted to a juror's attempt to impeach the jury's verdict. Appellants point out that such impeachment has been long forbidden in Delaware. *See Styler v. State,* Del.Supr., 417 A.2d 948 (1980); *State v. Watson,* Del. Super., 186 A.2d 543 (1961), *aff'd* Del.Supr., 184 A.2d 780 (1962).

This rule was formulated to encourage open discussion among jurors and to discourage the opportunities to harass and tamper with jurors. *See McDonald v. Pless,* 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915). However, courts dis-

covered early in their application of the rule that a flat prohibition against receiving impeaching testimony would tend to inhibit the redressing of injuries to the private litigant where a verdict had been reached by a jury that was not impartial. *McDonald, supra,* at 267, 35 S.Ct. at 784. A more flexible rule was necessary in order to prevent impeachment as to matters which must be considered part and parcel of the jury verdict, while enabling the court to discover the existence of extraneous influences which have no place in the jury verdict. In Delaware this compromise was codified in the Delaware Uniform Rules of Evidence 606(b).

■ Although D.R.E. 606(b) specifically permits a juror to testify as to "extraneous prejudicial information" and to "outside influence improperly brought to bear upon any juror," that rule of evidence has not been interpreted by the federal courts as permitting testimony as to subjective prejudice, (some of which was submitted in this case). *See Government of Virgin Islands v. Gereau,* 523 F.2d 140, 149, 150 (3d Cir. 1975); *United States v. Duzac,* 622 F.2d 911, 913, 914 (5th Cir.1980).

We find appellant's argument as to impeachment of the jury verdict to be without merit. Much of the testimony presented on the bias issue dealt with the "extraneous prejudicial information" and improper "outside influence" to which some jurors were improperly exposed before deliberations began. To some extent the witness did attempt to analyze what influence these factors had upon the jury, and he should not have been asked to do so.

■ However, although some of the testimony presented in the post-verdict hearing went beyond the scope permitted under D.R.E. 606(b), such excess is deemed to have constituted harmless error since the trial judge was very familiar with the rules of evidence, and it is apparent from his decision that he applied them properly in determining which evidence he was free to consider. The trial judge carefully noted that he based his decision on statements

made in the jury room "during the course of the trial, before the completion of the evidence ... which ... were not a part of the jury deliberations."

Appellants next contend that the specific allegations considered by the trial judge were insufficient to overcome the presumption of validity accorded the jury verdict. The issue here is whether the totality of circumstances, as revealed by the record then before the trial judge, justifies the conclusions he reached. The allegations lead to the inquiry but it is the total record (and not merely the allegations) by which the action taken is tested. Furthermore, the judge who observed the entire trial and presided over the post-verdict hearing is in a unique position to evaluate not only the weight of the evidence, but also the sufficiency of its totality. We find no lack of evidence to support the trial judge's conclusion that a new trial should be granted in view of the record of bias which was made before him. Consequently, the Superior Court determination was within the bounds of reason and did not constitute an abuse of discretion.

## II

■■■ Other issues raised by appellant on appeal stem from a contention that the

judge presiding at the third trial erred in his charge to the jury in that he: (A) used an inapplicable statute in his charge to the jury, and (B) gave the jury an erroneous charge as to the defense of contributory negligence. We find no merit to these contentions.

(A) The accident occurred when Mrs. Toppin, having stopped at a stop sign and observing no traffic in either direction, pulled out into the favored highway and was struck by a police car. The police vehicle was alleged to have been traveling at approximately 60 miles per hour in a 40 mile per hour zone without audible or visual emergency signals. Plaintiffs contended that the police officer's negligent operation of the police vehicle was the proximate cause of the accident.

The defendants on the other hand, claimed that the police vehicle was being operated under the conditions described in 21 *Del.C.* § 4106(c) [4] and, therefore, was not bound by the speed limit (although the officer was subject to other duties of care specified in the statute).

The defendants also alleged that the plaintiff-driver was guilty of contributory negligence—in particular, her al-

---

4. 21 *Del.C.* § 4106. *Authorized emergency vehicles.*

(a) The driver of an authorized emergency vehicle, when responding to an emergency call or when in the pursuit of an actual or suspected violator of the law or when responding to but not upon returning from a fire alarm, may exercise the privileges set forth in this section, but subject to the conditions herein stated.

(b) The driver of an authorized emergency vehicle may:

(1) Park or stand, irrespective of the provisions of this chapter;

(2) Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;

(3) Exceed the speed limits so long as he does not endanger life or property;

(4) Disregard regulations governing direction of movement or turning in specified directions.

(c) The exemptions herein granted to an authorized emergency vehicle shall apply only when such vehicle is making use of audible or visual signals meeting the requirements of this title, except that an authorized emergency vehicle operated as a police vehicle need not make use of such signals.

(d) The foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others.

(e) Authorized emergency vehicles within the meaning of this chapter mean vehicles of a fire department, police vehicles, ambulances, vehicles used by a fire chief, assistant fire chief, fire engineer or fire policeman of any duly organized fire company in the performance of his duties and emergency vehicles of state, federal, county or municipal departments or public service corporations as are designated or authorized by the Secretary.

(Subsections (d) and (e) of 21 *Del.C.* § 4106 were subsequently amended in 1982.)

leged violation of the stop sign statute. 21 *Del.C.* § 4164.[5]

Under these circumstances, it becomes necessary for the trial judge to explain the standard of care required of the respective drivers. If the police officer was found to be excused from obeying the speed limit under 21 *Del.C.* § 4106, then his movements were governed, in part, by subsection (d) of the aforementioned statute which requires drivers of authorized emergency vehicles "... to drive with due regard for the safety of all persons." As a result both parties would be governed by the usual rules of negligence.

In his attempt to make the differing rules clear to the jury, the trial judge made reference to the statute governing the operation of private vehicles which are approached by emergency vehicles and police vehicles using audible or visual signals. 21 *Del.C.* § 4134.[6]

This statute had no direct application in this case because there was no claim by either party that the police officer was using any such signals. The trial judge referred to this statute, however, and explained it to the jury. He reasoned that even if the police officer had the protection of § 4106, he was still under a "duty to drive with due regard for the safety of all persons"; and to comply with that standard of care the officer might have been required to give audible or visual signals under the circumstances. In other words, the trial judge charged on § 4134 because he thought that the standards set forth in that statute had some relevance to the standards the police should adhere to when operating under § 4106. This general approach is supported by this Court's decision in *Matthews v. Bryerton*, Del.Supr., 193 A.2d 83 (1963), which points out that the motor vehicle code should be interpreted as a whole, rather than as a series of individual enactments.

Appellants contend that the reference to a statute finding no direct applica-

---

**5.** 21 *Del.C.* § 4164. *Stop signs and yield signs.*

(a) Except when directed to proceed by police officers or traffic-control devices, every driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop at a marked stop line, but if none, before entering the crosswalk on the near side of the intersection or if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection.

(b) The operator of any vehicle who has come to a full stop as provided in subsection (a) of this section shall yield the right-of-way to any vehicle or pedestrian in the intersection or to any vehicle approaching on another roadway so closely as to constitute an immediate hazard and shall not enter into, upon or across such roadway or highway until such movement can be made in safety.

(c) Whenever a yield sign notifying drivers to yield the right-of-way has been erected, it shall be unlawful for a driver of any vehicle on the highway whose traffic is regulated by such a sign to fail to yield the right-of-way to any vehicle approaching on or from another highway or merging roadway or to a pedestrian legally crossing a roadway. If required for safety to stop, the stop shall be made at a marked stop line, but if none, before entering the cross-

walk on the near side of the intersection or if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection. Any such driver having so yielded to any vehicle in the intersection or approaching on another roadway so closely as to constitute an immediate hazard or to a pedestrian legally crossing a roadway shall not enter into, upon or across such roadway or highway until such movement can be made in safety.

**6.** 21 *Del.C.* § 4134.

(a) Upon the immediate approach of an authorized emergency vehicle making use of audible or visual signals, or of a police vehicle properly and lawfully making use of an audible signal only, the driver of every other vehicle shall yield the right-of-way and shall immediately drive to a position parallel to, and as close as possible to, the right-hand edge or curb of the roadway clear of any intersections and shall relinquish the right-of-way until the authorized emergency vehicle has passed, except when otherwise directed by a police officer.

(b) This section shall not operate to relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons using the highway.

tion in this case was so confusing to the jury as to be reversible error. We find no merit to this contention. While it was clear that the statute was not directly applicable it is also evident that the statute could have some bearing on the care required of emergency police vehicles.

(B) Appellants contend that the trial judge instructed the jury that the rules relating to contributory negligence, which he had already explained at length, would find possible application if the police officer was not operating his vehicle as an authorized emergency vehicle under 21 *Del.C.* § 4106 at the time of the accident.

Appellants assert that the judge went on to say or imply that those rules of contributory negligence would find no possible application if the officer were found to be traveling under the provisions of that statute (that is, if he were an emergency vehicle pursuing a suspected speeder). We find this contention to be based on an extremely strained interpretation of part of the charge to the jury. We think that the charge, read as a whole, makes it clear that contributory negligence was an overriding defense.

### III

■ Finally, appellants urge that the trial judge in the third trial erred when he refused to grant a directed verdict in favor of defendants and denied post-trial motions for judgment notwithstanding the verdict or for a new trial. The argument is that Mrs. Toppin, having stopped at the stop sign, had no right to proceed into the favored highway until "such movement can be made in safety." 21 *Del.C.* § 4164(a). Appellant contends that since she was hit as she entered the intersection, she violated the statute and was contributorily negligent as a matter of law.

This argument fails to take into account *the fact that the* presumption of negligence arising from the facts is rebuttable, and

that there is evidence which could support a conclusion that Mrs. Toppin's negligence (if any) was not a proximate cause of the accident. We find no error in the rulings made by the trial judge.

\*     \*     \*

The judgment of the Superior Court is AFFIRMED.