Freddy FLONNORY, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 421, 443, 1999.

Supreme Court of Delaware.

Submitted: April 17, 2001.
Decided: Aug. 14, 2001.

Bernard J. O'Donnell, Esquire (argued), Brian Bartley, Esquire and Kester I.H. Crosse, Esquire, Office of the Public Defender, Wilmington, Delaware, for appellant.

Thomas E. Brown, Esquire (argued), Timothy J. Donovan, Jr., Esquire and Elizabeth R. McFarlan, Esquire, Department of Justice, Wilmington, Delaware, for appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices (constituting the Court en Banc).

HOLLAND, Justice.

This is a direct appeal by the defendant-appellant, Freddy Flonnory, following the imposition of a death sentence.[1]  Flonnory

---

1. Both a direct appeal as well as an automatic appeal from the death sentence were docketed on Flonnory's behalf.

and Korey Twyman, were charged by indictment with two counts of Intentional Murder and related offenses. Upon Flonnory's application, the co-defendants' cases were severed.

After a jury trial, a guilty verdict was returned against Flonnory on all counts. A penalty hearing was conducted thereafter. The jury unanimously found, beyond a reasonable doubt, that a statutory aggravating circumstance existed. In addition, the jury found, by a vote of 9–3, that the aggravating circumstances outweighed the mitigating circumstances. The trial judge sentenced Flonnory to death by lethal injection. Additional sentences were imposed for the non-capital offenses.

Flonnory has raised nine issues in this appeal. In this decision, however, we consider only his contention that his right to a fair trial before an impartial jury, under the United States Constitution and the Delaware Constitution, was violated by improper highly prejudicial extraneous influences on his jury. We have determined that argument is meritorious. Consequently, the judgments of the Superior Court must be reversed. This matter is remanded for a new trial.

### Facts

Angela Farmer and Danya "Duke" Adams were murdered on July 13, 1996. The events that lead to their deaths began two weeks earlier. On July 1, 1997, Richard Grantham was driving near Gander Hill in Wilmington, Delaware, with Adams and Dwayne Warren. While stopped at a red light, Grantham saw Korey Twyman, Korey's brother Terrell, and Freddy Flonnory nearby. Korey picked up a bottle or brick and threw it at Grantham's car. Grantham drove off through the red light and went straight to the west side of Wilmington, where Adams retrieved his handgun.

Adams, Grantham and Warren then drove back to the scene of the earlier incident looking for Korey. As they drove towards 24th and Market Streets, they were approached by Korey, Flonnory and others. Korey hit Grantham in the head with a bottle and Grantham was beginning to be pulled from the car. Adams, however, fired several shots, causing the crowd to disperse and the car drove away. One of the bullets struck Korey in the arm. He went to a local hospital for treatment. Another bullet passed through Flonnory's shirt but missed his body. A third bullet hit the car belonging to Flonnory's mother that was parked near the intersection. She and her grandchildren were near or in the car. Flonnory's girlfriend had also been in his mother's car. Wilmington police responded to the incident, but witnesses at the scene did not cooperate with their inquiries.

During the next two weeks, Korey expressed a desire to retaliate against Adams and the "westside boys" for the shooting. On July 13, 1997, Flonnory, like Korey, told others that he wanted to retaliate for the July 1 incident. Flonnory tried to recruit Terrell to join him, but he declined.

Shortly before midnight on July 13, 1997, Korey and Flonnory obtained a ride to the west side of Wilmington with Lionel "Moose" Robinson. After circling the area around 6th and Madison Streets, Korey spotted Adams and instructed Robinson to park at 6th and Washington Streets. Korey and Flonnory left the car and asked Robinson to wait for them to return. The two then proceeded through an alleyway that exited onto the 600 block of Jefferson Street.

Adams, Dwayne Warren, Angela Farmer and "Dewey" were sitting or standing

under a tree on Jefferson Street. According to the State, Korey and Flonnory stepped from the alley across the street and both started shooting. Angela was hit three times and fell dead from a fatal shot to the chest. Dewey managed to flee the scene. Adams was struck by two bullets. Warren, himself struck by two bullets in the leg, tried to carry Adams behind a car after Adams had been shot. Adams' injuries, however, turned out to be fatal. As he was dying, Adams said "that nigger Box" to Warren. "Box" was a nickname used by Flonnory.

Flonnory testified that he thought he and Korey were heading to "rumble" or fist-fight with young rivals. According to Flonnory, Korey was armed with a gun solely in the event the rivals were armed and started shooting as they had two weeks before. Flonnory testified that he followed Korey towards Jefferson Street through the narrow alleyway and stopped to urinate before fighting. According to Flonnory, Korey drew his weapon and started shooting towards the others on Jefferson Street. Flonnory said he heard a second, louder weapon returning fire, but he did not see who was returning fire. Flonnory testified that he was not armed and did not fire a weapon. When he heard return fire from the group on Jefferson Street, he ran away. Korey and Flonnory both returned to Robinson's car.

The State presented evidence that contradicted Flonnory's testimony. The police retrieved evidence of two different guns used in the attack. The police also found no evidence to support Flonnory's allegation that the victims returned fire.

Korey and Flonnory were indicted jointly. The cases were severed prior to trial. Korey was convicted of Murder in the First Degree. Because he was only fifteen at the time of the murders, Korey was not eligible for the death penalty.

### Improper Prejudicial Juror Contacts

In the fifth week of Flonnory's capital murder trial, juror Number Six reported that she had been approached by an unknown woman on the previous day and also that morning regarding her jury service. The two encounters occurred while juror Number Six waited with other jurors in a remote designated parking area and while she was en route by bus with other jurors to the courthouse. Juror Number Six was concerned that the unknown woman knew her name. She told the bailiff of the matter, who in turn informed the trial judge.

The trial judge met with the attorneys and juror Number Six. Juror Number Six told the trial judge that she did not know the woman who had approached her. According to juror Number Six, in the first interaction, the unknown woman asked if juror Number Six was serving on a jury. Juror Number Six replied that she was serving on a jury but could not discuss the case.

The next day, the unknown woman again approached Juror Number Six as she exited her car. By then, the unknown woman had ascertained juror Number Six's name and that she was a juror in Flonnory's case. The unknown woman told juror Number Six that her roommate worked at the prison. The unknown woman asked if juror Number Six knew "about Freddy's childhood and all that stuff" and that Flonnory had been incarcerated as a juvenile at Ferris. Most significantly, the unknown woman told juror Number Six that Flonnory had "killed more than two people and they're not allowed to let [the jury] know."

During this interview with the trial judge, juror Number Six was apparently concerned about her safety because the unknown woman knew her name. The trial judge told juror Number Six that he

would provide security from the bus stop to the courthouse. The trial judge never instructed juror Number Six that the prejudicial statement about Flonnory's involvement in a prior murder was false. Instead, the trial judge simply asked juror Number Six whether this incident would affect her impartiality. Juror Number Six told the trial judge that this exchange with the unknown woman had not caused her to form any opinions and that she had no reservations about continuing to serve as a juror in Flonnory's case.

Juror Number Six also told the trial judge that the unknown woman had also approached two other jurors. The trial judge then interviewed those two other jurors in the presence of the attorneys. Those individuals were juror Number Four and juror Number Nine.

In an interview with the trial judge, juror Number Four confirmed that she was questioned by the unknown woman but tried not to pay attention to her. Juror Number Four stated that before reporting the contact to the bailiff, juror Number Six had told all of the other jurors about what had happened. According to juror Number Four, juror Number Six "kind of blew things out of proportion when she went into the jury room and started talking to everybody about it." Juror Number Four told juror Number Six that she should not have discussed the matter in the jury room but should have brought the matter to the trial judge's attention. Juror Number Four was asked by the trial judge whether this incident with the unknown woman would affect her impartiality. She said it would not.

The third juror, juror Number Nine, confirmed that the unknown woman was questioning him and the other two jurors. He said that he had tried not to pay attention to her and did not remember what she said. He told the unknown woman that they could not talk about the case.

The trial judge inquired about whether juror Number Nine could remain impartial. He responded that he could.

At the conclusion of the inquiry with the three jurors, none of the attorneys asked for additional action by the trial judge. Accordingly, the trial judge did not ask any of the other jurors what they had been told by juror Number Six, even though juror Number Four had related that juror Number Six "started talking to everybody about it," and even though he had sought assurance of their ability to remain impartial from juror Number Six, Number Four, and Number Nine. When the full Flonnory jury panel was assembled in the courtroom, the trial judge issued a general admonition that the jurors should not discuss the case with others. He also advised the jurors to contact the bailiff immediately if anyone approached them.

The following morning, the trial judge advised counsel that the unknown woman who had been speaking with the three members of Flonnory's jury had been identified as a juror in another case. In the courtroom, the trial judge then advised the *entire* Flonnory jury that the unknown woman, who had been speaking with three of them during the previous two days, was a juror in another case. The trial judge assured Flonnory's jury that no one had reason to be concerned for their safety.

Accordingly, the record reflects that the trial judge was obviously certain that all of the Flonnory jurors knew about the unknown woman's contacts with the three jurors. The unknown woman's status as a juror in another case may have assuaged the Flonnory jurors' safety concerns. Unfortunately, it may have also given credence to her prejudicial remarks, in particular, that Flonnory had committed murder before.

Flonnory's trial concluded the following day. Two days later, on a Saturday, the

jury returned a verdict of guilty on all charges. The jurors were then excused for a few days before the penalty phase of Flonnory's capital murder trial.

### Irreparable Jury Prejudice

On the Monday following the Saturday verdict, while the proceedings were in recess, juror Number Twelve, came to the courthouse. The juror wanted to report her concerns about extraneous information that the jury had received. Outside of the presence of other jurors, the trial judge convened the attorneys and conducted an interview with juror Number Twelve under oath.

Juror Number Twelve confirmed juror Number Four's earlier report that juror Number Six had actually told all of the other jurors about the substance of what the unknown woman had said to her before juror Number Six was interviewed by the trial judge. Juror Number Twelve testified that, according to juror Number Six, the unknown woman had asked juror Number Six if she was serving on the Freddy Flonnory case, and then "went on to tell her ... you know he's been accused of murdering someone else before." Juror Number Twelve testified that Juror Number Six "said this to each and every one of us while we were sitting there." According to Juror Number Twelve, Juror Number Six only reported her contact with the unidentified woman to the bailiff upon the urging of other jurors, "but it was too late then. She had already told us everything."

When questioned by the trial judge as to what other outside information was known to the jury, Juror Number Twelve also reported that:

Okay. Well, there's—It was more than one person. It was just one of the jurors, while we were deliberating, had said that the defendant had been in possession of a gun at nine years old. And

I said how do you know that? You're not supposed to know these things.

Juror Number Twelve identified juror Number Five as the juror who informed jurors of Flonnory's alleged possession of a gun at the age of nine. Juror Number Twelve also reported that juror Number Nine had maintained his own personal notebook, which he took home every night, contrary to the directions of the trial judge and said that what others did not know did no harm. Juror Number Twelve also said several jurors knew more than they were told during trial, indicating that they knew "he had previously shot somebody."

Juror Number Twelve testified that her improper knowledge of Flonnory's alleged involvement in a prior murder affected her vote to find Flonnory guilty of Murder in the First Degree rather than Murder in the Second Degree. Juror Number Twelve was excused briefly after this initial interview. The trial judge stated: "I do find her to be credible. I have no reason to believe she is not credible." The trial judge also stated: "I mean she said what she said. I believe that she considered it" i.e., the statement from juror Number Six that Flonnory had been accused of murdering someone before.

### Mistrial Motion Denied

At the conclusion of the interview with juror Number Twelve, the trial judge had grave cause for concern. One reason for concern related to juror Number Nine's disregard for the trial judge's instruction not to keep separate notes of the trial. A second reason for concern was one or more other jurors apparent disregard for a separate ongoing admonition not to read newspaper accounts of the proceedings because some of the juror information related to juror Number Twelve, concerning Flonnory's prior criminal justice system history, closely paralleled accounts that appeared in a local newspaper. Each of those mat-

ters merited an independent inquiry to evaluate their prejudicial impact on the ability of certain jurors individually and the entire jury panel collectively to proceed.[2] Nevertheless, the trial judge took no action.

Those concerns paled, however, in comparison to juror Number Twelve's sworn testimony regarding the unknown woman's prior prejudicial contact with juror Number Six. First, the trial judge heard a sworn account from juror Number Twelve, which he found to be credible, that juror Number Six told all of the jurors that Flonnory had previously been accused of murdering someone else. Second, juror Number Twelve stated that highly prejudicial improper information from juror Number Six *actually* influenced her own decision to convict Flonnory of Murder in the First Degree. Despite this report of presumptive prejudice with regard to the entire Flonnory jury panel and actual prejudice with regard to juror Number Twelve, the trial judge declined to interview the other jurors.

Flonnory's attorneys moved for a mistrial at the conclusion of the trial judge's interview with juror Number Twelve. In an oral ruling, the trial judge denied Flonnory's motion for a mistrial. The trial judge noted that a record of juror Number Twelve's testimony had been made for an appeal to this Court.

In denying Flonnory's motion for a mistrial, the trial judge observed that from "the justice system point of view, from a case management point of view, it would be better to go forward." The trial judge then proceeded to the penalty phase in this capital case. The trial judge permitted the jury to hear and decide the penalty phase of Flonnory's trial without any additional corrective, cautionary, or limiting instructions.

In a motion for a new trial, Flonnory's attorneys renewed their allegation of juror prejudice. In denying that motion, the trial judge ruled that Flonnory's right to a fair trial had not been prejudiced either by the fact that juror Number Six told the other jurors that Flonnory had been accused of murder before or by the fact that juror Number Twelve testified that juror Number Six's information had actually affected her decision to find Flonnory guilty as charged of Murder in the First Degree. The trial judge then sentenced Flonnory to death by lethal injection.

### Jury's Democratic Function

The right of one accused of a crime to have his or her case presented before a jury enjoys a long and distinguished heritage in Anglo–American law. In his *Commentaries on the Laws of England,* Sir William Blackstone wrote:

Our law . . . wisely placed this strong and two-fold barrier, of presentment and a trial by jury, between the liberties of the people and the prerogative of the crown. It was necessary, for preserving the admirable balance of our constitution, to vest the executive power of the laws in prince and yet this power might be dangerous and destructive to that very constitution, if exerted without check and control, by justices of *oyer* and *terminer* occasionally named by the crown . . . who might then . . . imprison, dispatch or exile any man that was obnoxious to the government, by an instant declaration that such is their will and pleasure. But the founders of English law have contrived that . . . the truth of every accusation . . . should . . . be con-

---

**2.** It is particularly significant to note that, during the pre-trial jury *voir dire,* a potential juror was excused for cause because she had mistakenly read a newspaper article mentioning Flonnory's "long history of violence and crime."

firmed by the unanimous suffrage of twelve of his equals and neighbours, indifferently chosen and superior to all suspicion.[3]

The first jury was probably empanelled in Delaware in 1669 and juries were an established component of the judicial process by 1675.[4] Since Delaware's first constitution, adopted in the fall of 1776, Delaware has afforded the right to trial by jury in both criminal and civil proceedings. The *Declaration of Rights and Fundamental Rules of the Delaware State,* guaranteed the right to trial by jury to all citizens and included a statement "[t]hat trial by jury of facts where they arise is one of the greatest securities of the lives, liberties and estates of the people." [5]

John Dickinson, a lawyer and one of Delaware's delegates to the Philadelphia Convention that drafted the United States Constitution wrote that "[t]rial by Jury is our birth-right." In a letter to Pierre S. duPont, Thomas Jefferson described the fact-finding function of jurors as:

the very essence of a Republic .... We of the United States ... think experience has proved it safer for the mass of individuals composing the society to reserve to themselves personally the exercise of all rightful powers to which they are competent ....

Hence, with us, the people ... being competent to judge of the facts occurring in ordinary life, ... have retained the functions of judges of facts under the name of jurors....

I believe ... that action by the citizens, in person in affairs within their reach and competence, and in all others by representatives chosen immediately and removable by themselves, constitutes the essence of a Republic.... [6]

The right to a fair trial before an impartial jury of one's peers is fundamental to the American criminal justice system. The United States Supreme Court has held:

The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges.

**3.** 4 William Blackstone, Commentaries *343, *quoted in Duncan v. Louisiana,* 391 U.S. 145, 151–52, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

**4.** *See Claudio v. State,* Del.Supr., 585 A.2d 1278, 1290 (1991) (citing 1 J. Scharf, HISTORY OF DELAWARE 519 (1888)).

**5.** *Declaration of Rights and Fundamental Rules of the Delaware State* § 13 (1776).

**6.** Letter from Thomas Jefferson to Pierre S. duPont (April 4, 1816), *in 4 Annals of America* 414 (Encyclopedia Britannica 1976); *see* 2 J. Kendall Few, *In Defense of Trial by Jury* 456 (1993).

Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence.[7]

## Jury Trial Rights

Both the Sixth Amendment to the United States Constitution[8] and Article I, § 7 of the Delaware Constitution guarantee defendants in criminal cases the right to have their cases brought before an impartial jury.[9] The Sixth Amendment to the United States Constitution states:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

Article I, § 7 of the Delaware Constitution provides:

In all criminal prosecutions, the accused hath a right to be heard by himself and his counsel, to be plainly and fully informed of the nature and cause of the accusation against him, to meet the witnesses in their examination face to face, to have compulsory process in due time, on application by himself, his friends or counsel, for obtaining witnesses in his favor, and a speedy and public trial by an impartial jury; he shall not be compelled to give evidence against himself, nor shall he be deprived of life, liberty or property, unless by the judgment of his peers or by the law of the land.

An essential ingredient of this right is for jury verdicts to be based solely on the evidence presented at trial.[10] The accused's rights to confrontation, cross-examination and the assistance of counsel assure the accuracy of the testimony the jurors hear and safeguard the proper admission of other evidence.[11] These rights can be exercised effectively only if evidence is presented to the jury only in the courtroom.[12] Consequently, the right to a

7. *Duncan v. Louisiana,* 391 U.S. 145, 155–56, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

8. *See also* U.S. Const. Art. III, § 1 ("The trial of all Crimes, except in Cases of Impeachment, shall be by Jury.").

9. The Sixth Amendment guarantee of an impartial jury is "incorporated" against the States through the Due Process Clause of the Fourteenth Amendment. *Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) ("Because we believe that trial by jury in criminal cases is fundamental to the American scheme of justice, we hold that the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which ... would come within the Sixth Amendment's guarantees."); *see id.* at 156, 88 S.Ct. 1444 ("The deep commitment of the Nation to the right of jury trial in serious criminal cases as a defense against arbitrary law enforcement qualifies for protection under the Due

Process Clause of the Fourteenth Amendment, and must therefore be respected by the States.").

10. *Hughes v. State,* 490 A.2d at 1040 (citing *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *In re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948)).

11. *Smith v. State,* Del.Supr., 317 A.2d 20, 23 (1974).

12. *Id.* ( "[F]airness, and indeed the integrity of the judicial process, make it imperative that jurors secure information about the case only as a corporate body in the courtroom.").; *see also Turner v. Louisiana,* 379 U.S. 466, 472–73, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) ("In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full

fair trial by an impartial jury in a criminal proceeding, that is guaranteed by both the United States Constitution and the Delaware Constitution requires that "the jury's verdict be based on evidence received in open court, not from outside sources." [13]

In construing the federal constitutional right to a fair trial by an impartial jury, the United States Supreme Court has held that:

> [t]he theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by an outside influence, whether of private talk or public print. [14]

In *Marshall v. United States*, [15] the Court specifically held that the exposure of jurors to extraneous material concerning a trial "may indeed be greater than when it is part of the prosecution's evidence, for it is then not tempered by protective procedures." [16] The *ratio decidendi* of *Marshall* has been expressly adopted by this Court. [17]

### Proving Juror Taint

■ It is very difficult for any defendant to prove *actual prejudice* within a jury panel. [18] This difficulty is attributable to the sanctity of the jury's deliberations and the common law prohibition against jurors impeaching their own verdict. [19] Both the United States Supreme Court and this Court have recognized, however, "that a flat prohibition against receiving post-verdict testimony from jurors would contravene another important public policy: that of 'redressing the injury of the private litigant where a verdict was reached by a jury that was not impartial.'" [20]

The need to accommodate the conflicting policies of preserving the sanctity of a jury's deliberations and the defendant's right to an impartial jury has resulted in the recognition of a distinction between extrinsic and intrinsic influences upon a jury's verdict. [21] "Since the 19th Century, the established rule regarding a juror's competence to attack a verdict is that 'a juryman may testify to any facts bearing

judicial protection of the defendant's right of confrontation, cross-examination, and of counsel.").

**13.** *Marshall v. United States*, 360 U.S. 310, 312–13, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (per curiam); *Hughes v. State*, Del.Supr., 490 A.2d 1034 (1985).

**14.** *Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907).

**15.** 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

**16.** *Id.* at 313, 79 S.Ct. 1171.

**17.** *Hughes v. State*, Del.Supr., 490 A.2d 1034, 1046 n. 16 (1985) ("Although the Supreme Court opinion in *Marshall* was issued pursuant to that court's supervisory powers and is therefore binding only on the federal courts, we consider the opinion to be persuasive authority for the position we advocate herein.").

**18.** *Massey v. State*, Del.Supr., 541 A.2d 1254, 1257–58 (1988).

**19.** *Sheeran v. State*, Del.Supr., 526 A.2d 886, 894 (1987):

> As a general rule, a juror may not impeach his own verdict once the jury has been discharged. *McDonald v. Pless*, 238 U.S. 264, 267, 35 S.Ct. 783, 59 L.Ed. 1300 (1915). This rule promotes several public policies: 1) discouraging harassment of jurors by losing parties eager to have the verdict set aside; 2) encouraging free and open discussion among jurors; 3) reducing incentives for jury tampering; 4) promoting verdict finality; and 5) maintaining the viability of the jury as a judicial decision-making body.

**20.** *Id.* at 895 (citing *Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907)).

**21.** *Id.*

upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his [or her] mind.'" [22] The common law prohibition against inquiry into the jurors' mental processes is adhered to in Delaware.[23] It has been codified in Delaware Rule of Evidence 606(b):

COMPETENCY OF JUROR AS WITNESS. *Inquiry into Validity of Verdict or Indictment.* Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying he received for these purposes.[24]

Accordingly, Delaware Rule of Evidence 606(b) permits juror testimony for the purposes of impeaching a verdict in two instances: (1) when "extraneous prejudicial information [is] improperly brought to the jury's attention"; or (2) when "outside influence [is] improperly brought to bear upon any juror." [25] Nevertheless, inquiry into the jurors' mental processes remains prohibited.[26]

### *Presumption of Prejudice*

■ As a general rule, when a defendant seeks to impeach a verdict for alleged juror misconduct, the defendant has the burden of establishing both the improper influence and actual prejudice to the impartiality of the juror's deliberations.[27] This Court has frequently analyzed the difficulty of proving actual prejudice, since Rule 606(b) places significant restrictions on the jurors' ability to impeach their own verdict.[28] In an effort to accommodate the evidentiary limitation imposed by Rule 606(b)'s prohibition against any inquiry into a juror's mental processes, this Court has adopted an egregious circumstances test.[29]

■ If a defendant can prove a reasonable probability of juror taint, due to egregious circumstances, that are inherently prejudicial, it will give rise to a presumption of prejudice and the defendant will not have to prove actual prejudice.[30] This test raises a presumption of prejudice and achieves the proper balance between pre-

---

**22.** *Id.* (citing *Mattox v. U.S.*, 146 U.S. 140, 149, 13 S.Ct. 50, 36 L.Ed. 917 (1892)); *see also Hughes v. State*, Del.Supr., 490 A.2d 1034 (1985).

**23.** *See Massey v. State*, 541 A.2d at 1257; *Burke v. State*, Del.Supr., 484 A.2d 490, 500 (1984); *see also McDonald v. Pless*, 238 U.S. 264, 267, 35 S.Ct. 783, 59 L.Ed. 1300 (1915); *Sheeran v. State*, Del.Supr., 526 A.2d 886, 894 (1987) (permitting only two exceptions, both codified in our Rules of Evidence).

**24.** D.R.E. 606(b).

**25.** *Id.*

**26.** *See id.; Burke v. State*, Del.Supr., 484 A.2d 490, 500 (1984).

**27.** *Sheeran v. State*, Del.Supr., 526 A.2d 886, 896–97 (1987); *Hughes v. State*, Del.Supr., 490 A.2d 1034 (1985). *McCloskey v. State*, Del.Supr., 457 A.2d 332, 337–38 (1983). *But cf. Barnes v. Toppin*, Del.Supr., 482 A.2d 749, 753 (1984) (evidence supported trial court's finding that extraneous matter probably played a role in deliberations).

**28.** *See e.g., Massey v. State*, Del.Supr., 541 A.2d 1254, 1259 (1988).

**29.** *Id.*

**30.** *Id.* at 1257.

serving the sanctity of the jury's deliberations, by adherence to Rule 606(b)'s prohibition against inquiry into a juror's mental processes,[31] and the defendant's right to a fair trial by an impartial jury.

### Flonnory Presumptively Prejudiced

■ Proof of other crimes, wrongs or bad acts is generally not admissible evidence in any criminal proceeding.[32] Although there are several exceptions to this general rule, even relevant evidence of other crimes or wrongs is only admitted after the trial judge performs three important safeguarding functions. First, the trial judge must make a specific determination that the proposed evidence of other crimes, wrongs or bad acts is relevant to something fairly at issue in the trial.[33] Second, even if such evidence is relevant, the trial judge may exclude that relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury."[34] Third, after making that independent judicial determination, if the trial judge concludes that the relevant evidence of other crimes, wrongs or bad acts is admissible, the jury must be given a limiting instruction that restricts the jury's use of the evidence to its proper scope.[35]

Most significantly, if proof of other crimes, wrongs or bad acts is admitted into evidence in the courtroom, the defendant has the assistance of counsel in not only cross-examining the witness who presents that evidence but also in arguing the defendant's perspective on that evidence to the jury. Those protections can be exercised effectively only if evidence of other crimes, wrongs, or bad acts is presented in the courtroom.[36] Nevertheless, even with all of the foregoing procedural safeguards, it would be extremely unlikely that evidence of the defendant's involvement with another homicide would ever be properly admitted into evidence at a defendant's separate trial for murder.

■ The threshold question is whether Flonnory has presented a case of egregious circumstances so inherently prejudicial as to raise a presumption of prejudice in his favor. This Court has held "fairness and, indeed, the integrity of the judicial process, make it imperative that jurors receive information about the case only as a corporate body in the courtroom."[37] The record reflects credible uncontradicted evidence that, outside of the courtroom, Juror Number Six became an unsworn and uncross-examined witness who presented inadmissible evidence to the other jurors that Flonnory had previously been accused of murder.[38] In an analogous context, this Court held that a presumption of prejudice was established because improper juror knowledge of a defendant's prior conviction of the very crime for which he is being tried is "so fraught with prejudice that the constitutional due process defect is not cured either by jurors' assurances that they could remain impartial or by the judge's admonition to disregard the knowledge."[39] Similarly, juror Number Six's

**31.** *Id.* at 1259

**32.** D.R.E. 404.

**33.** D.R.E. 403.

**34.** D.R.E. 403.

**35.** D.R.E. 105; *see Getz v. State,* Del.Supr., 538 A.2d 726 (1988).

**36.** *Smith v. State,* Del.Supr., 317 A.2d 20, 23 (1974).

**37.** *Id.*

**38.** *Diaz v. State,* Del.Supr., 743 A.2d 1166, 1180 (1999).

**39.** *Hughes v. State,* Del.Supr., 490 A.2d 1034, 1046 (1985).

improper statement to the other jurors that Flonnory had previously been accused of murder—the exact same type of crime he stood trial for here—presented a case of egregious circumstances so inherently prejudicial as to raise a presumption of prejudice.

The trial judge's decision, after interviewing jurors Six, Four and Nine, to make no further inquiry or to give any type of curative instruction to the jury is difficult to understand. The record reflects that earlier in the trial, the parties stipulated before the jury that Flonnory was prohibited from possessing a firearm because of unspecified conduct for which he had been adjudicated to be delinquent when he was a juvenile. Consequently, at this stage of Flonnory's trial, the jury had heard properly admitted evidence in the courtroom that when Flonnory was a juvenile, he had committed an "unspecified" crime that would have been a felony if he had been an adult.

The trial judge should have made certain that no juror was thinking that unspecified felonious conduct was a prior murder. The trial judge attributes his inaction to the failure of the attorneys to make a request. The United States Supreme Court has held, however, that it is the duty of the trial judge to take effective action to assure that the balance in a trial is not unfairly shifted against the accused.[40]

Because the guilt phase of Flonnory's trial had been completed when juror Number Twelve testified that inherently prejudicial information had been communicated to the other jurors by juror Number Six, there was a manifest necessity to declare a mistrial.[41] Flonnory's motion should have

been granted. Therefore, we hold that the communication of highly prejudicial improper and inadmissible information by juror Number Six to the other jurors, outside of the courtroom, violated Flonnory's right to a fair trial by an impartial jury under both the United States Constitution and the Delaware Constitution. Consequently, Flonnory's convictions must be reversed and this matter will be remanded for a new trial.

### Actual Prejudice Established

■ The trial judge's questioning of juror Number Twelve extended beyond the parameters permitted by D.R.E. 606(b). The trial judge should not have asked juror Number Twelve exactly how the extraneous prejudicial information affected her own deliberative process with regard to voting to convict Flonnory on each charge in the indictment. Those inquiries were harmless, however, because within the proper bounds of permissible inquiry the existence of an improper extraneous prejudicial influence that compromised juror Number Twelve's impartiality was established.[42]

■ Consequently, the record reflects that, in addition to proving a presumption of prejudice, Flonnory has also established actual prejudice. Juror Number Twelve testified that her improper knowledge of Flonnory's alleged involvement in a prior murder actually affected her vote to find Flonnory guilty of Murder in the First Degree. The trial judge stated: "I do find her to be credible. I have no reason to believe she is not credible." The trial judge also stated: "I mean she said what she said. I believe that she considered it"

---

**40.** *Sheppard v. Maxwell,* 384 U.S. 333, 362, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

**41.** *See Bailey v. State,* Del.Supr., 521 A.2d 1069 (1987).

**42.** *McCloskey v. State,* Del.Supr., 457 A.2d 332 (1983); *see also Barnes v. Toppin,* Del. Supr., 482 A.2d 749 (1984).

i.e., that the statement that Flonnory had been accused of murdering someone before.

■ A defendant in a criminal case is denied his right to a fair trial by an impartial jury if only one juror is improperly influenced.[43] Accordingly, Flonnory's demonstration of actual prejudice through the sworn testimony of juror Number Twelve constitutes an alternative basis for our conclusion that Flonnory's convictions must be reversed. We hold that the communication of highly prejudicial improper and inadmissible information from juror Number Six to juror Number Twelve alone, outside of the courtroom, violated Flonnory's right to a fair trial by an impartial jury under both the United States Constitution and the Delaware Constitution.

### Other Issues

Flonnory has raised eight other issues in this appeal. First, he submits that the incriminating hearsay statements of the co-defendant, Korey Twyman, were admitted into evidence in violation of: 11 *Del. C.* § 3507; the rule against the admission of hearsay; and his constitutional rights to confrontation of any witness again him. Second, Flonnory argues that the trial judge lacked discretion to continue to sequester his mother after she had testified. By doing so, Flonnory contends that the trial judge denied his constitutional rights to a public trial and equal protection of law. Third, Flonnory alleges that the purported exclamation "that nigger Box" attributed to one of the decedents was not admissible pursuant to the dying declaration rule. Fourth, Flonnory contends that the trial judge improperly permitted a police detective to vouch for the credibility of a key prosecution witness and permitted the jury to consider the same officer's opinion concerning Flonnory's own credibility. Fifth, Flonnory submits that the trial judge erroneously deprived him of the opportunity to confront Dwayne Warren's testimonial claim of a non-violent nature by forbidding inquiry concerning Warren's recent arrest for armed robbery and possession of a firearm. Sixth, Flonnory argues that the trial judge erred in finding Terrell Twyman's statements and trial testimony to be voluntary. According to Flonnory, Terrell Twyman's six-month detention as a material witness was without sufficient cause. Flonnory argues that this detention rendered Terrell Twyman's trial testimony involuntary, as a matter of law, and thereby deprived Flonnory of a fair trial. Seventh, Flonnory contends that the trial judge's refusal to consider Flonnory's consumption of alcohol and marijuana prior to the shootings in mitigation rendered the decision to impose the death penalty arbitrary and capricious. Finally, Flonnory submits that his sentence of death is disproportionate to sentences imposed in similar cases.

■ Since the first claim of error raised by Flonnory required his convictions to be reversed, we have decided not to address his other claims of error in this appeal. We have concluded, however, that a different judge should be assigned to preside at Flonnory's new trial. We have absolutely no doubt that the original trial judge could fairly and impartially preside at Flonnory's new trial. If Flonnory's new trial proceeds to another penalty phase, however, the public's confidence in the impartial administration of justice would be enhanced if Flonnory were not sentenced by a judge who had previously decided that a death sentence was the appropriate punishment for Flonnory's conduct.

**43.** *Hughes v. State*, Del.Supr., 490 A.2d 1034, 1047 (quoting *Styler v. State*, Del.Supr., 417 A.2d 948, 951–52 (1980)); *Lovett v. State*, Del. Supr., 516 A.2d 455, 475 (1986).

Many of the other claims raised by Flonnory may never arise at a new trial or may arise in a different context. The different judge should be free to rule on all issues raised at Flonnory's new trial in the context presented at the time. Accordingly we hold that none of the trial judge's rulings at Flonnory's first trial shall constitute the law of this case at his new trial.

### *Conclusion*

It is regrettable that a juror from another case irresponsibly persisted in improperly telling several of the jurors in Flonnory's case information she admitted they should not know: Flonnory had previously been accused of murder. It is also unfortunate that juror Number Six, who at the time had legitimate concerns for her own safety, communicated this highly prejudicial and inadmissible evidence to the other Flonnory jurors outside of the courtroom. Perhaps there was nothing the trial judge could have done to avoid declaring a mistrial before the jury began deliberating Flonnory's guilt or innocence. Clearly, however, there was a manifest necessity to declare a mistrial when the jury deliberated with knowledge of that highly prejudicial information.

Thankfully, this and other similarly egregious circumstances that result in compromising a jury's impartiality are rare. When they do occur, however, the integrity of the judicial process must be preserved by affording a defendant, like Flonnory, the right to a new fair trial before an impartial jury. The judgments of the Superior Court are reversed. This matter is remanded for a new trial before a different judge.