STATE of Delaware

v.

Luis G. CABRERA, Defendant.

Criminal Action Nos. IN–99–04–0314 to IN–99–04–0319.

Superior Court of Delaware, New Castle County.

Submitted: Feb. 4, 2008.
Decided: Aug. 7, 2008.

Steven P. Wood, Esquire, Loren C. Meyers, Esquire, and Kevin M. Carroll, Esquire, Department of Justice, Wilmington, DE, for the State.

Thomas C. Grimm, Esquire, and Rodger D. Smith, II, Esquire, Morris Nichols Arsht & Tunnell, LLP, Wilmington, DE, for defendant Luis Cabrera.

## OPINION

HERLIHY, Judge.

As a result of three separate incidents involving three jurors during his 2001 trial, defendant Luis Cabrera has asked this Court for permission to conduct an *ex parte* interviews of all jurors. He also argues that if he cannot, the professional conduct rule prohibiting him from doing so, Rule 3.5(c) of the Delaware Lawyers' Rules of Professional Conduct, violates his federal and state constitutional rights to a fair trial and free speech. He also asserts that Rule 3.5(c) operates as an unconstitutional prior restraint in violation of the federal and state constitutions. This challenge, to the Court's knowledge, is the first constitutional attack on the Delaware Professional rules regulating attorney contact with jurors outside of a court setting.

The Court is satisfied that there is no need to contact the trial jurors. The issues about which Cabrera claims there is such a need were thoroughly explored at his trial over seven years ago. In any event, rule 3.5(c) permits examination of jurors consistent with Delaware Rules of Evidence § 606. Even though that results in such examination being conducted under judicial supervision, Rule 3.5(c) does not operate to violate any of Cabrera's constitutional rights.

For these reasons Cabrera's motion to contact trial jurors *ex parte* is **DENIED**.

## *Factual Background*

In February 2001, Cabrera was convicted of two counts of first degree murder. There were two victims. He was sentenced to death for those convictions. His convictions and sentences were affirmed on appeal.[1] He has filed his first motion for postconviction relief. As part of that motion, he has filed this discrete motion to conduct *ex parte* interviews of all of the jurors from his 2001 trial. In consideration of his motion, the Court finds it necessary to review and set out in detail the record involving each of the three jurors from the trial upon which Cabrera relies to now seek his *ex parte* interviews of all the jurors.

### *Juror # 9*

During the State's case-in-chief, Juror # 9 reported to the Court that Cabrera's wife, Stephanie, looked familiar to her.[2] The Court interviewed the juror as a result of this report. The juror had taught at Springer Middle School in north Wilmington from 1994 or 1995 to 1998. She had moved on to another school, one in Pennsylvania. The juror knew Mrs. Cabrera was not a teacher at Springer because she had known all the teachers. The things that seemed familiar to her were Mrs. Cabrera's glasses and maybe her hair. Mrs. Cabrera was a teacher at Springer at the time of the 2001 trial. The juror reported, nevertheless, that she did not know Mrs. Cabrera, which she stated in response to a question about her ability to judge her as a witness.

The juror was requested, that should anything further come up which triggered a memory, to let the bailiff know. Nothing

1. *Cabrera v. State,* 840 A.2d 1256 (Del.2004).

2. Trial transcript, 1/23/01 at pp 73–4.

further was reported to the bailiff or the Court.

The defense had no applications at any time involving this juror.[3]

### *Juror # 8*

The State rested on February 1, 2001, and a note was received from Juror # 8 later that day stating:

Dear Judge Herlihy,

I'm writing this note to you with the attitude of doing the right thing.

Early in the trial as we were lining up to exit the jury room one of the female voices behind me in line said, "I think he's guilty." Because I didn't want to be obvious, I didn't torn to look and see who said it. Instead telling myself to deal with it the next time I heard it.

Yesterday another juror mentioned her seriousness to be impartial even to the extent of her facial expressions. So that leads me to believe that it was Bonnie, the tall blond with straight hair who made the remark.

The defendant is innocent until all the evidence is in and heard.

Thanks in advance for your wisdom in this matter.

Sincerely, Juror # 8[4]

After consulting with counsel, the Court first interviewed Juror # 8. She informed the Court that she had heard a female voice remark "he's guilty" during the first few days of the trial. Trial had started on January 18, 2001. The juror repeated the circumstances during which she heard the remark; that is, it was from a female voice coming from behind her while the jurors were lined up to return to the courtroom. But she was unable to identify the female juror whom she said made the remark. Juror # 8 had not reported the earlier remark earlier because, she said, she did not have "enough evidence to say anything."[5] The other juror's remark Juror # 8 reported, the one about the seriousness of the case and keeping a neutral facial expression, had been made on January 31st. This second juror was not the one who made the remark about "guilt."

Juror # 8 said the remark about "guilt" would not influence her decision making. Nor had she discussed it with anyone else.[6] After consultation with counsel about the questions to be asked, each of the other jurors were then individually interviewed.[7] Each juror (and the three remaining alternates) was asked these same questions with identical or similar wording to these:

1. First, have you heard anyone express any opinion about the evidence in this case or the guilt or innocence of the defendant?

2. And that would be either in this courtroom, out in the hallway or in the jury room or any other location.

3. Have you expressed any opinion about the evidence in this case or the innocence of the defendant?

4. Do you understand that you must hear all of the evidence in the case, counsels' remarks and my instructions on the law before deciding the case?

No juror reported hearing any other juror remark about the defendant's guilt. This included the remaining female jurors

---

3. *Id.* at p. 77.

4. Court Exhibit 6.

5. Trial transcript 2/1/01, at p. 20.

6. Throughout the Court's questioning of Juror # 8, the Court was consulting with all counsel about further areas to explore.

7. See e.g., defense counsel's suggestion, Trial transcript 2/1/01, at p. 38.

serving on the case as of February 1st of which there were eight among the fifteen then remaining. One female juror had already been excused. As there were two female jurors standing behind Juror # 8, assuming they were lined up in order to return to the courtroom, it was significant that no female juror heard the "guilty" remark.

The Court did not make an immediate ruling but recessed to give defense counsel an opportunity to discuss what they—and the defendant—wanted to do.[8] After the recess, defense counsel asked for further time to reflect on a course of action. During an exchange between Court and counsel, the Court remarked, "I am satisfied the remark ("I think the he's guilty.") had been made."[9] After that finding, there was further discussion about what to do, proceed with defense witnesses, question the jurors more, etc. There was another recess; this one at the defense request. After reconvening briefly, the jury was brought in and excused to go to lunch.

The Court and counsel then engaged in a further exchange regarding what to do. Defense counsel believed they were compelled to move for a mistrial, but also indicated the defendant did not want to do that.[10] Ultimately, the Court and counsel worked out a procedure whereby the panel, after returning from lunch recess, as a whole, was addressed and asked:

> Court: Ladies and gentleman, sorry again to keep you waiting. I think the reason for the waiting and the procedure we have been going through today will become more obvious as I speak.
>
> To repeat in part what I said to each of you individually this morning, a matter was brought to my concern which required me to question each of you. Each of you were asked the same three questions. After talking to all of you this morning, I have a concern that one of you may have said something.
>
> Now, it's possible that the words I used in the questions this morning may not have been clear enough to jog your memory or whatever, or maybe they were. I don't know. I'm giving you the benefit of the doubt here. There's some concern that I have that one of you may have expressed an opinion concerning the guilt or innocence of Mr. Cabrera.
>
> The circumstances, as I understand that they may have been, were when you were in the jury room waiting to come back in or lining up to come back into the courtroom and that during the process of sort of getting in line to come back in, and this is several weeks ago apparently, somebody may have said something which may have been interpreted as an expression of the guilt or innocence of Mr. Cabrera, which, as you all know, is not permissible, but it just may have been said. These things happen from time to time, but it may have been said, or some words that somebody may have interpreted to that effect.
>
> My questions to each of you this morning may not have—they were deliberately a little vague, to be honest with you. So that's one of the reasons I'm giving the benefit of the doubt and also, because this incident apparently occurred early in the trial, which would have been a couple weeks ago, that it may not have come back to

8. *Id.* at p. 71.

9. *Id.* at p. 77.

10. *Id.* at pp. 97, 108.

mind when I was talking to each of you this morning, to anybody who may have said it or overheard it.

And it is not necessarily a particular specific set of words. It's just something in the nature of a concept of whether anybody made or overheard any comment concerning the guilt or innocence of the defendant, whether a juror made such a comment or whether another juror overheard another juror make such a comment concerning the guilt or innocence of Mr. Cabrera. It may not have been expressed quite in those words. And it is important for you to search your memories.

Again, I described the circumstances. It was several weeks ago when you were lining up to come back into the courtroom, sort of to get in the numerical sequence of your setting here, such as Juror No. 3, Juror No. 9, things like that, but before you came in and while you were in the jury room and shortly after the actual trial began, not while we were in the jury selection process, but after the actual trial began.

And it may be that somebody didn't recall this or didn't interpret my questions as addressing what was said or overheard. Who knows that? But it is important to think about it on your part.

And I'm not trying to embarrass anybody by this, but it is something, based on the information which brought—got this thing going this morning, that we need to do some further things. So what I'm going to ask you to do is this. Take out a blank—don't do it in—when you get back into the jury room, take out a blank piece of paper from your note pad. Fold it over and put your juror number on the front of it, just your number. Inside answer yes or no to the following question. Did you make or overhear any comment concerning the guilt or innocence of the defendant? Yes or no. Each of you has to vote. And you'll do it on an individual piece of paper.

When all 15 persons have voted—please put your number on the outside and yes or no inside—hand it to the bailiff. He will bring it to me. And we will just see where we are at that particular point.

So, please, consider the circumstances I have described to you and what I'm telling you. I'll now ask you to retire to the jury room. Thank you.[11]

With the exception of Juror #8, the remaining jurors marked, "No" on their individual ballots. There was more conversation between the Court and counsel over what steps to take next. One was to re-interview Juror #8, which was done. That additional questioning did not develop any further information, and she was excused to return to the jury room.

Defense counsel shortly thereafter reported to the Court that the defendant would not be moving for a mistrial. Counsel had discussed the options among themselves and with the defendant. The Court engaged in a colloquy with counsel about that decision (covering several pages of trial transcript). The Court then made these findings, among others:

I am satisfied that any of the 12 jurors who retire to deliberate on this case, whether it be the current first 12 or any alternate substitute for them, will be able to—are impartial and will be able to render a fair and impartial verdict and

11. *Id.* at pp. 118–121.

will be able to follow properly the Court's instructions, will keep an open mind about the evidence that is yet to be introduced and will properly, impartially and appropriately deliberate on the verdict and give proper evaluation to the evidence and listen to the Court's instruction.

I'm not satisfied, despite the finding I made earlier about the comment having been made, that any juror at this moment has any improper, unfair, or inappropriate bias or has improperly, unfairly formed an opinion at this stage of the trial before the evidence has been concluded, before they heard counsels' closing remarks and before I have given them their instructions on the law.

So I think in terms of where we are as far as this jury, I see no reason to question any—question Juror 8 anymore, to question any other jurors or the jury as a whole. I'm satisfied they can continue to sit.

 \*  \*  \*  \*  \*  \*

Following the announcement of these findings, the Court engaged in direct colloquy with the defendant:

Now, Mr. Cabrera, I need to ask you certain questions, sir.

If you have any doubt about whether you to answer them or should answer them, you may feel free to consult with counsel first; okay?

Defendant: Yes.

Court: You have been present today during all the proceedings during which we have questioned jurors individually, collectively also, particularly Juror 8, correct?

Defendant: That's correct, Your Honor.

Court: Okay. And you have heard the letter that she has written to me that I received this morning.

Defendant: I did.

Court: Are Mr. Figliola and Mr. Deckers correct that it is your desire, knowing everything that has happened today, that you have heard, that you do not want to move for a mistrial?

Defendant: That's correct, Your Honor.

Court: Are you satisfied that you had enough time to think about that decision?

Defendant: 100 percent, Your Honor.

Court: Is that your decision separate from the advice that Mr. Deckers and Mr. Figliola have given you?

Defendant: Well, they came to me. They explained all aspects of it. They expressed what can and can't happen. They asked my thoughts. They gave me their opinions. We came to a conclusion. And—you know, we're all in agreement.

Court: Okay. Let me ask it a slightly different way.

Lawyers, as you know, can advise and clients decide.

Defendant: Yes.

Court: Is this a decision that is your own decision, or is it a decision that is partly in consultation with the two of them?

Defendant: Well, after reviewing all that was, you know, put on the table, I decided it was in my best interests.

Court: Okay. Do you also understand that the—it is their right, as your attorneys in this matter, to move for a mistrial even though you don't want them to?

Defendant: Yes, I do understand that, Your Honor.

Court: Okay. Do you realize that by not moving for a mistrial, we proceed along with the presentation of your evidence and then get into the closing

aspects of this case then jury deliberations?

Defendant: Yes, I do.

Court: And you understand, therefore, that the deliberation could result in a finding of guilty?

Defendant: I do.

Court: And that the decision to not now present a motion for mistrial will, as time elapses or events unfold, make it harder fo you to claim, well, gee, I should I have presented a motion for mistrial or told my lawyers to present a motion for mistrial?

Defendant: I have full understanding of that.

Court: You understand the risk involved three?

Defendant: I do, Your Honor.

Court: Now, the risk includes that if you are found guilty of first degree murder, we go to a penalty hearing. Do you understand that?

Defendant: Yes, I do.

Court: And do you understand there is a risk, as a result of that penalty hearing, there could be a recommendation from the jury that I impose a sentence of death on you?

Defendant: I understand that, Your Honor.

Court: And, again, it may make it harder later to argue back then, back now, today, I should have asked for a mistrial.

Defendant: I know this, Your Honor.

Court: You are accepting that risk?

Defendant: I am.

Court: Now, if you don't move for a mistrial here or at any other time, and there might be—who knows? There could be something else that comes along that would give separate ground for counsel to move for mistrial, but let's confine it to the issue regarding the jury today and what we have heard about today.

Do you understand that if you are convicted and whatever the sentence might be on appeal, it is going to be harder to argue that you should have had a mistrial for all the reasons we have heard today?

Defendant: I understand, Your Honor.

Court: Do you also understand if you are convicted and sentenced and the conviction is upheld on the direct appeal—that's the initial appeal to the Delaware Supreme Court—and sometime later you decide to file a motion for postconviction relief, during which you say these lawyers didn't do the right thing for you because they didn't move for a mistrial, since you consented to not moving for a mistrial, it is going to be harder to make that argument?

Defendant: That was explained to me, Your Honor, and I do understand it.

Court: You are willing to accept that?

Defendant: Yes, I am, Your Honor.

Court: And that would apply to any other possibility, postconviction remedy, including a federal habeas corpus. Possibility I'm talking.

Defendant: So be it. I understand it.

Court: Is this your decision in which you—in your view, is a voluntary decision?

Defendant: It is, Your Honor.

Court: Is anybody forcing you to make this decision?

Defendant: No, sir.

Court: and you understand you have a right to disagree with your lawyers and tell them that you do want them to move for a mistrial?

Defendant: Trust me, I do understand that, Your Honor.

Court: Okay. Do you, in your view, think you had enough time to think about this decision and the consequences we just talked about?

Defendant: Yes, Your Honor, I have.

Court: Do you want any more time to talk to them about this decision or the consequences?

Defendant: Absolutely not.

Court: Okay. You may have a seat, Mr. Cabrera. Thank you.[12]

After this colloquy, the Court and counsel took up the bailiff's report that after her third interview, Juror # 8 cried. The decision was made to take no action. The jury was brought in and excused with these admonitions:

> It is essential that you not speculate about that, about any of this stuff that we have been going through today. It is particularly essential that you remember that we have not heard all of the evidence in this case, that you are still to keep an open mind. You must hear the balance of the evidence. You must hear the closing remarks of the lawyers. You must listen to and follow what I say about the law that you have to apply in connection with this case and in connection with the factual decisions you, as the jury, will have to make ultimately. You must keep an open mind. You must decide this case impartially, without emotion, bias, sympathy, but to declare the proper verdict based on the evidence and the law.[13]

There was no further applications from either side about all this.

12. *Id.* at pp. 159–60.

13. *Id.* at pp. 179–80.

14. Trial transcript, 2/9/01, at pp. 8–9.

### Juror # 5

The jury started the guilt phase deliberations around 3:30 p.m. on February 8, 2001. They ended deliberations for the day around 5:15 p.m. and were sequestered overnight at a nearby hotel. Deliberations resumed the next morning at 9:30 a.m.

The Court received the first of several notes from Juror # 5 at 10:15 a.m. asking about some evidence. The jury was brought to the courtroom at 11:05 a.m. when the note and answer were read to it.[14]

The Court received a second note from Juror # 5 at 1:50 p.m. that same day. Shortly thereafter, the Court met with counsel to discuss how to answer or respond to it. It read:

> Your Honor—
> I would like to be excused from this jury. I fear my mental health is at stake. I have given my time & attention to this case & believe I have been objective. I believe that some of the other jurors are grabbing at imaginary straws & at this rate we will never have a verdict. I refuse to be part of the jury that frees this defendant.
> —May I speak to you alone w/o jury?
> Juror # 5[15]

The Court noted in its conversation with counsel that the juror is (then) 25 years old and a registered nurse at Christiana Hospital. All counsel and this Court were very concerned about and sensitive to court intervention, or merely speaking to the panel as a whole, being perceived by this juror or any other(s) as intimidation. There was a lengthy discussion whether to give an "Allen"[16] type charge. The Court

15. Juror # 5 note # 2.

16. *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

declined to do so. There had been several recesses in the conversations with counsel about this note to give time for legal research and reflection. Those conversations and recesses lasted nearly three hours. In the meantime, there was no contact with Juror # 5 or the jury as a group.

Near the end of the discussions with counsel the Court received another note from Juror # 5 around 4:50 p.m. It read:

The comment about my "mental state/health" was not meant to be a problem. I was frustrated & I felt that in such a serious/strenuous situation, I should be able to have a bailiff escort me to one of these empty rooms for a few minutes. The smokers can go outside, I just want the same privilege. I am sorry for any confusion or trouble I have caused. I certainly don't want you to think I am nuts or schizo.[17]

The Court and counsel had a brief consultation about this note. The jury had told the bailiff it wanted to stop deliberating at 4:30 p.m., but due to the counsel/Court conferences and recesses, it was not excused for the night until shortly after 5:00 p.m. The instructions given then were the usual ones for jurors going to

into sequestration overnight.[18] Nothing specific was directed at Juror # 5.[19]

The jury resumed its deliberations at 9:00 a.m. on February 10th. At 2:25 p.m., the Court received a new note from Juror # 5. It read:

Your Honor

I learned today when I called my husband that I was not paid from my employer for jury duty this last pay since I was not in work this past Monday to submit my summary. I had a grand mal seizure Monday morning & was taken to Christiana ER by paramedics. My nurse manager saw me in the ER so because I didn't go to work Monday as planned, I could not hand in my summary. One of the other jurors works for Christiana Care & he is not required to hand in a summary to get paid. I made my best attempt to not allow the seizure to interfere with jury duty. Not getting paid is making this difficult for more being here, not being able to contact my employer. Could you call my employer or speak to me.

Juror # 5[20]

Before being able to consult with counsel, the Court received a note from Juror # 2 which read:

as you know, all twelve jurors must unanimously agree to the jury's verdict. Each of you should decide the case for yourself but only after impartially considering the evidence with your fellow jurors. And in the course of deliberations, do not hesitate to reexamine your first impression or to change your opinion if you are convinced by the discussions. However, no juror is to surrender his or her own conscientious convictions solely because of the opinions of your fellow jurors or for the mere purpose of returning a verdict. You are officers of the court and must act impartially, that is, without favoring either side but based on the evidence and with a desire to declare the proper verdict.

20. Juror # 5 note # 4.

---

17. Juror # 5 note # 3.

18. Trial transcript, 2/9/01 at pp. 31–3.

19. The Court proposed to counsel giving an instruction regarding and repeating the points about process of deliberations, in addition to the normal ones given when a jury is excused overnight. However, after getting Juror # 5's late afternoon note, the Court decided not to give it. All counsel concurred in that decision. The proposed "targeted" instruction read:

I want to remind you about certain things concerning your deliberations. You have a duty to consult with one another and to deliberate with an open mind and with a view to reaching a verdict. All the issues should be fully discussed giving a fair opportunity for each juror to express his or her views. And

*Juror # 2*

In the concluding section of "instructions to the jury," it says each verdict must be unanimous. What if it becomes apparent during deliberation, that a unanimous decision will never be reached? What consequences does this pose? And where do we (the jurors) go from here?[21]

Just after 3:00 p.m., the Court met with counsel about both of these notes. Concern was expressed about individual notes coming from jurors and not through the foreman. Eventually the Court had the jury come into the courtroom, around 3:45 p.m., where an instruction was read to which all counsel and the defendant agreed:

> Court: Good afternoon Ladies and Gentlemen. Little over an hour ago I received one note from one of you and then about 45 minutes ago, a second note from another juror. It took a few moments to get everybody assembled that needs to discuss these notes to come up with answers that I am going to give you now in connection with those two notes.
>
> One note is of a personal nature regarding employment. And if this juror would please give me the name and telephone number in a written form, hand it to the foreman, who will give it to the bailiff either now or at some other point in case you don't know it, I will personally make the call to insure that there is no problem there with the employer or anything else of that nature.
>
> That is standard, routine procedure in cases if there is ever a question regarding employment or anything, pay, or anything else. Particularly when

you are sort of in an incommunicado situation as you are here.

Next note was from another juror, that is one that came to me about 45 minutes ago. That was more in connection with deliberations. That was a note of personal nature. It is premature for me to answer that note. And so I am not going to give an answer to it at this point. But I will ask the jury as a whole to do two things if there is a question of a personal nature such as employment or something else like that that you would like to bring to my attention. Just give the note to the foreman to give to the bailiff or give it as you did before, or if there is anybody else who wants to pass on something else of a personal note not related to deliberations, not relating to any question on the law and not relating to any questions, any evidence, or anything else or anything in the instructions. Because sometimes there are questions that may be more of a personal nature as one of those notes was and something that has a little bit more to do with, in a general sense, with the deliberations.

Those notes that relate to deliberations or questions on the law or evidence of that nature should be written out by the juror, who does or does not, this is the juror's choice, have to identify himself or herself by name or number and hand it to the foreman who would hand them to the bailiff. So make sure that everything in a sense is funneled through the foreman if you wish particularly in the case of a note that has something to do with substantive matters in the case and not a personal question or issue that you may have.

---

21. Juror # 2 note # 1.

We try to address those personal things little bit different, of course, from the substantive things so that we don't want to deter anybody from addressing those questions. But we also want to make sure that any questions relating to any of the substantive matters, questions on the law, or evidence, or instructions, or whatever, be funneled exclusively through the foreman. But he is required certainly to do so. He can either write out the question or the juror or any jurors can write down the question. There is no magic to that. That should be the procedure.

The question does not necessarily have to be one that is reviewed with all jurors before that happens because I told you when there is a question which we can answer, the procedure is I bring you back in. I read the question to all of you and read my answer to all of you, okay. With those comments in mind I am going to ask you to return to the jury room to resume your deliberations.

Any questions, Ladies and Gentlemen, just please write them out okay.[22]

Shortly, thereafter, with counsel's permission and at Juror # 5's request, she was allowed to call her husband, in a bailiff's presence. The call was to contact her boss about not being paid.

Around 5:30 p.m., the Court received this note from the foreman:

Judge Herlihy

It is the consensus of the jury that we cannot make a unanimous decision.

Jury Foreman[23]

Counsel and the Court consulted again. This discussion involved whether to give an "Allen" instruction, mention the possi-

bilities of considering lesser includeds, etc. Eventually, shortly after 6:00 p.m., the jury was brought into the courtroom. The Court instructed it to stop deliberating and also said:

Court: Ladies and Gentlemen, good evening. I received a note from your foreman stating as follows, quote, Judge Herlihy, it is the consensus of the jury that we cannot make a unanimous decision, period, end of quote.

Now I am going to endear me to you by doing a couple of things. I am not going to discharge you. I am going to direct you stop your deliberations, and you will be housed again tonight as you have been for the last two nights. Before you leave I want to read to you some instructions. I am reading it to you now so that you can think about what I am saying in here. I realize that may not make me the most popular person in the world. Where we are I believe it appropriate to read these instructions to you. I wish to suggest a few thoughts which you may desire to consider in your deliberations which you will presume tomorrow morning along with the evidence and instructions previously given to you.

Every case is important to the parties affected. This trial has been time consuming and expensive to both the parties. If you should fail to agree upon a verdict the case is left open and undecided. Like all cases it must be disposed of at some time. There appears to be no reason to believe that another trial would not be equally time consuming and expensive to all persons involved, nor does there appear to be any reason to believe that

22. Trial transcript 2/10/01 at pp. 14–17.

23. Jury Foreman's note.

the case can be tried again any better or more exhaustively than has been in this trial, and any future jury must be selected in the same manner from the same source as you have been chosen. So there appears to be no reason to believe that the case would ever be submitted to 12 men and women more intelligent, more impartial, or more competent to decide it or that more or clearer evidence could be produced on behalf of either side.

Of course these matters suggest themselves, upon brief reflection, to all of us who may have sat through the trial. The only reason they are mentioned is because some of them may have escaped your attention, which must have been fully occupied up to this time in reviewing the evidence in this case.

These matters which along with other an perhaps more obvious ones remind us how important and desirable it is for you to unanimously agree upon a verdict, if you can do so without violence to your individual judgment and conscious.

It is unnecessary to add that the Court does not wish any juror to surrender his or her conscientious convictions. However, it is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment.

Each of you must decide the case for yourself. You should do so only after consideration of the evidence which with your fellow jurors and in the course of your deliberations you should not hesitate to change your opinion when convinced that it is erroneous.

In order to bring 12 minds to unanimous result, you must examine all of the questions submitted to you with candor and with frankness and with proper deference to and regard for the opinions of each other.

That is to say in conferring together each of you should pay due attention and respect to the view of the others and listen to each other's arguments with a disposition to re-examine your own views.

If the greater number of you are for one side, each dissenting juror ought to consider whether his or her position is a reasonable one since it makes no effective impression on the minds of so many equally, honest, intelligent fellow jurors who bear the same responsibility, serve under the same sanction of the same oath and have heard the same evidence and with we may assume the same attention and equal desire to arrive at the truth. Also, the jurors who constitute the greater number should consider the reasons of those who take a different position to see whether there may be persuasive merit in that position. You are not partisans, you are judges, judges of the facts.

Your sole purpose is to ascertain the truth from the evidence before you. You are the sole and exclusive judges of credibility of all the witnesses and to the weight and effect of all the evidence.

Remember, at all times no juror is expected to yield his conscientious—his or her conscientious conviction which he or she may have as to the weight and effect of the evidence and remember also after full deliberation and consideration of all the evidence, it is your duty to agree on a verdict if you can do so without violating juror's individual judgment and conscious.

You may conduct your deliberations as you choose, but I suggest that you

should go forth now and retire and as I say you will resume your deliberations tomorrow and when you do carefully consider all of the evidence bearing on all of questions before you and see whether it is not possible to arrive at a unanimous verdict as to all those questions.

If, however, upon further every deliberations you believe that a unanimous verdict is simply not possible, please so inform the bailiff. I do not intimate in any way that you must remain together until a verdict is reached, nor do I intimate you must deliberate for an unreasonable length of time before being discharged, but as I said at this point I want you now to first stop your deliberation for the evening, and think about what I have said in these further remarks and then you may consider them collectively when you resume your deliberations tomorrow when all 12 of you are in this jury room together then.

Thank you very much, Ladies and Gentlemen. Have a pleasant evening. See you tomorrow.[24]

The jury left for its hotel at 6:11 p.m. The jury resumed its deliberations the next morning, February 11th. The Court was informed at 12:45 p.m. that the jury had reached a verdict. The jury came into the courtroom around 1:40 p.m. to announce it had found the defendant guilty as charged, particularly of two counts of murder in the first degree.

### Discussion

### I

Cabrera's request to conduct *ex parte* interviews of jurors starts with the indisputable premise that he was entitled to an impartial jury and a fair trial. He correctly states these rights are secured by the Sixth Amendment to the United States Constitution and Article I, § 7 of the Delaware Constitution. While rights protected by the Delaware Constitution can be more extensive than as protected under the United States Constitution,[25] in this instance, the rights to a fair trial and an impartial jury are protected as broadly under both constitutions.[26]

To insure that these rights were sufficiently protected, Cabrera contends he should be able to interview all of the trial jurors regarding those matters covered in the notes from jurors 5, 8, and 9. Cabrera seeks court permission to conduct those interviews *ex parte* with each juror. But, he argues, there is an ethical impediment to doing so. That impediment is Delaware Lawyer's Rule of Professional Conduct 3.5(c) which states:

A lawyer shall not:

    \*    \*    \*    \*    \*    \*

(c) Communicate with a juror or prospective juror after discharge of the jury unless the communication is permitted by court rule.

Cabrera argues that if this Rule operates to deny his *ex parte* interviewing of jurors, it deprives or deprived him of his right to a fair trial and impartial jury. He adds that if the rule is read to bar such interviews, that also results in an infringement of his right to free speech as guaranteed by the First Amendment to the United States Constitution and Article I, § 5 of the Delaware Constitution. It operates, he argues, as an improper prior restraint.

24. *Id.* at pp. 30–35.

25. *Hughes v. State,* 490 A.2d 1034 (Del.1985).

26. *Jackson v. State,* 374 A.2d 1 (Del.1977); *Flonnory v. State,* 778 A.2d 1044 (Del.2001).

All of Cabrera's constitutional arguments derive from a United District Court of Hawaii decision, *Rapp v. Disciplinary Board of the Hawaii Supreme Court.*[27] Rapp, a lawyer, who represented himself, was a plaintiff in a civil matter. He wanted to talk to the jurors, along with opposing counsel, immediately after the trial. He wanted to know what went into the juror's thinking, whether there was a chance of fraud, etc. The trial judge denied the request.

Hawaii has a juror contact rule governing lawyers which read at the time:

3.5 A lawyer shall not:

\*     \*     \*     \*     \*     \*

(b) communicate ex parte with such person (juror) except as permitted by law.[28]

The Hawaii District Court found this Rule to be violative of Rapp's First Amendment right of free speech. The basis was that the phrase "as permitted by law" meant, under Hawaii judicial interpretation, a complete ban. Even though *Rapp* was decided solely on First Amendment grounds, Cabrera has also invoked it to argue that his rights to a fair trial and an impartial jury were violated.

The court in *Rapp* found the rule, as interpreted by state courts, to be unconstitutionally vague and over broad.[29] There was no good cause exception in it or implied through judicial interpretation. The *Rapp* court distinguished the Hawaii rule, as interpreted by its courts, from those no-contact rules in other jurisdictions which were found to pass constitutional muster. An example of such is the one reviewed in *Haeberle v. Texas International Airlines,*[30] which provided:

(N)either the attorney nor any party to an action nor any other person shall himself or through any investigator or other person acting for him interview, examine, or question any juror, relative, friend or associate thereof either during the pendency of the trial or with respect to the deliberations or verdict of the jury in any action, except on leave of the Court granted upon good cause shown.[31]

The request in *Haeberle* was to examine post-trial the jurors who had served. The ostensible purpose was for counsel to become better educated. The request was denied. The 11th Circuit was worried about post-verdict fishing expeditions. It found the jurors' right to privacy outweighed any interest in improving advocacy.[32] The rule was upheld in the face of the constitutional challenge.[33]

In a criminal case context, the First Circuit in *United States v. Kepreos*[34] upheld a challenge to a rule barring contact except under court supervision and then in extraordinary circumstances. The Court said:

Permitting the unbridled interviewing of jurors could easily lead to their harass-

---

**27.** 916 F.Supp. 1525 (D.Hawai'i 1996).

**28.** *Id.* at 1528.

**29.** *Id.* at 1526.

**30.** 739 F.2d 1019 (5th Cir.1984).

**31.** *Id.* at 1020–21.

**32.** *Id.* at 1022.

**33.** Accord *United States v. Hooshmand,* 931 F.2d 725 (11th Cir.1991); *United States v.*

*Griek,* 920 F.2d 840 (11th Cir.1991); *Maldonado v. Missouri Pacific Ry. Co.,* 798 F.2d 764 (5th Cir.1986); *State of New Jersey v. Loftin,* 287 N.J.Super. 76, 670 A.2d 557 (A.D.1996); *Florida Bar v. Newhouse,* 498 So.2d 935 (Fla. 1986).

**34.** 759 F.2d 961, (1st Cir.1985); *cert. denied,* 474 U.S. 901, 106 S.Ct. 227, 88 L.Ed.2d 227 (1985).

ment, to the exploitation of their thought processes, and to diminished confidence injury verdicts, as well as to unbalanced trial results depending unduly on the relative resources of the parties. (citations omitted).[35]

*Rapp* does not help Cabrera. The Hawaii rule challenged in Rapp is worded differently than Delaware's Rule 3.5(c). That difference alone is enough to distinguish *Rapp*.

There is scant Delaware jurisprudence either citing or interpreting our professional conduct rules governing post-verdict communication between counsel and jurors. A quarter century of Supreme Court decisions, however, makes it clear that our Supreme Court does not put on counsel the near total bar as the Hawaii Supreme Court had. These decisions make it clear that with an appropriate showing jurors can be questioned post-verdict, albeit not *ex parte*, but under judicial supervision. In short, no matter how Delaware's Rules of Professional Conduct governing post-trial contact have been written, there are proper means to engage in such communication.

Cabrera's constitutional challenges to Rule 3.5(c) raises an issue of first impression. It compels this Court to determine the meaning of "except as provided by court rule." The words "court rule" have not, to this Court's knowledge, been interpreted by a Delaware court. As a starting point, this Court has no "rule" regulating post-verdict counsel-juror communication. The examination of Supreme Court decisions over the last twenty-five years or so point to an answer of what "court rule" may encompass.

*A*

The first suggestion of an interrelationship of a professional conduct rule and a "rule" comes from *Burke v. State.*[36] In that case, the defendant moved for a new trial on the basis of a newspaper report that a juror said the defendants stared at the jurors and that she had interpreted this as attempted intimidation. The trial judge did not hold a hearing involving this or any other juror. That decision was upheld. The Supreme Court said to delve into this thought process was what Delaware Rule of Evidence 606(b) was "designed to cover."[37]

D.R.E. 606(b) became effective on July 1, 1980. It supplemented the "former black letter law" that a juror cannot impeach his or her own verdict.[38] *Burke* is the first case in which D.R.E. 606(b) is invoked and implicated. The Rule provides:

Competency of juror as witness.

(a) *At the trial.* A member of the jury may not testify as a witness before that jury in the trial of the case in which he is sitting as a juror. If he is called so to testify, the opposing party shall be afforded an opportunity to object out of the presence of the jury.

(b) *Inquiry into the validity of verdict or indictment.* Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except

---

35. *Id.* at 967.

36. 484 A.2d 490 (Del.1984)

37. *Id.* at 501.

38. *Massey v. State,* 514 A.2d 402, 404 (Del. 1986).

that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

It is important to note that at the time of *Burke*, Delaware's Professional Conduct Rule on post-verdict communication between counsel and jurors was this:

DR 7–108. Communication With or Investigation of Jurors.

(A) Before the trial of a case a lawyer connected therewith shall not communicate with or cause another to communicate with anyone he knows to be a member of the venire from which the jury will be selected for the trial of the case.

(B) During the trial of the case:

(1) A lawyer connected therewith shall not communicate with or cause another to communicate with any member of the jury.

(2) A lawyer who is not connected therewith shall not communicate with or cause another to communicate with a juror concerning the case.

(C) DR 7–108(A) and (B) do not prohibit a lawyer from communicating with veniremen or jurors in the course of official proceedings.

(D) After discharge of the jury from further consideration of a case with which the lawyer was connected, a lawyer shall not ask questions of or make comments to a member of that jury.

(E) A lawyer shall not conduct or cause, by financial support or otherwise, another to conduct a vexatious or harassing investigation of either a veniremen or a juror.

(F) All restrictions imposed by DR 7–108 upon a lawyer also apply to communications with or investigations of members of a family of venireman or a juror.

(G) A lawyer shall reveal promptly to the court improper conduct by a venireman or a juror, or by another toward a venireman or a juror or a member of his family, of which the lawyer has knowledge.

It is also important that this version had no escape clause or basis to allow post-verdict communication.

The saga of opinions relating to the murder trials of Robert Hughes provide important precedent for the issues confronted in this opinion. Hughes was convicted of first degree murder. The conviction was reversed on appeal.[39] There were several reasons for the reversal. One was that the jury was not sequestered during deliberations. While finding it was not a reason for reversal, the Court pointedly, nonetheless, criticized the prosecutor for his unethical comment at a news conference held during the deliberations which was widely reported in the media. This created a risk that the unsequestered jurors would see or hear what he said. The prosecutor's comment was that Hughes had taken a polygraph test during the investigative phase of the case. The result was not announced, however, but the inference was there.

The prosecutor's remarks became an issue in Hughes' second trial. Hughes was convicted a second time. He filed two motions for a new trial. Both were de-

---

**39.** *Hughes v. State,* 437 A.2d 559 (Del.1981)      (Hughes I).

nied. One of the motions was accompanied by affidavits (the Supreme Court did not clarify from whom). The affidavits suggested jurors in the second trial were aware of Hughes' earlier conviction and that he had taken a polygraph. The trial judge denied both motions.

Hughes appealed. The Supreme Court, however, before entertaining all the merits of Hughes' appeal, remanded the matter to this Court for a full evidentiary hearing, directing:

(1) That a full evidentiary hearing should be conducted by the Superior Court on the issue of any extraneous prejudicial information which might have been improperly known to the jurors prior to verdict in the above captioned case, including evidence upon the following questions:

(a) What did each member of the jury, including the alternates, know, if anything, prior to the verdict, regarding (i) the prior conviction of the defendant; and (ii) the existence of a polygraph test taken by the defendant and the results of such examination?

(b) What was the source of any such knowledge?

(c) When did such knowledge come to the juror?

(d) To what extent was such information known to or told the other jurors?

(2) That the results of such hearings is deemed essential to the final disposition of the case in the Superior Court and this Court;

NOW, THEREFORE, IT IS ORDERED:

(A) That the case be and it is hereby remanded to the Superior Court for such evidentiary hearing, to be held not later than 30 days from the date hereof;

(B) That, in conduct thereof, the following procedures shall be followed:

(I) Each member of the jury or alternate available by subpoena shall be examined separately, *in camera*, with full examination and cross-examination by defense counsel, and prosecuting attorney; and the scope of examination of each juror as a witness shall be as provided by D.R.E. 606(b).

(ii) The Superior Court shall hear testimony of such other witnesses (in addition to jurors and alternates) as will be helpful in resolving the issues posed at such hearing.

(iii) Defense counsel shall have the burden of going forward; but the burden shall shift to the State as to each juror examined, upon the making of a *prima facie* case of knowledge amounting to possible prejudice;

(iv) The conduct of counsel shall be strictly governed by DR 7–108, and, insofar as may be possible, the Superior Court shall protect jurors and other witnesses from harassment by members of the news media or any other person.[40]

For purposes of Cabrera's current motion, there are three key points in this remand order (regrettably not reported). First, the Supreme Court directed Superior Court to conduct post-verdict examinations of trial jurors. The second point is related to the first. It is that the lawyers

---

**40.** *Hughes v. State*, Del.Supr. No. 260, 1982, 474 A.2d 140, Herrmann, C.J. (ORDER, October 31, 1983).

in *Hughes* were to be governed by DR 7–108 regarding juror contact.

The third point in the *Hughes* remand order is the linkage in one place of D.R.E. 606(b) and a disciplinary rule, DR 7–108. To this Court's knowledge this is the only place in a Supreme Court opinion or order where both rules are cited.

D.R.E. 606(b) was next invoked in *Massey v. State*.[41] The defense requested a new trial based on an affidavit from a juror (who had produced the affidavit and how was not clear in the first *Massey* opinion) stating that he was under the influence of drugs and alcohol during parts or all of the 1978 trial in which Massey was convicted of first degree murder. This Court held an evidentiary hearing but the juror declined to testify, invoking his Fifth Amendment rights. As the statute of limitation had run since the hearing and since the trial judge had not considered the affidavit, the matter was remanded for an evidentiary hearing.[42] That hearing was to examine this one juror and any other available ones. It was to be conducted within the "constraints of D.R.E. 606(b)."[43]

The evidentiary hearing was held. The juror claiming drug and alcohol ingestion testified as did his drug counselor who had started to see him a year after the trial. Nine other jurors testified. The one juror testified about his drug and alcohol consumption during the trial. The other nine, however, testified they saw nothing during the trial to indicate this one juror was under the influence during the trial. The trial judge did not find the evidence war-

ranted a new trial. That decision was affirmed.[44]

In neither *Massey* opinion was there a reference to any rule of professional conduct. That is mildly curious because of the wording of DR 7–108 and that it probably was the defendant who got the affidavit from the juror. But of greater note is that, despite the ethical constraints in DR 7–108, the Supreme Court invoked D.R.E. 606(b) as the vehicle for post-verdict counsel-juror communication again, though, under court supervision.

D.R.E. 606(b) was next cited in *Sheeran v. State*.[45] In that case, the Supreme Court confronted the issue of claimed improper influence on a juror. A juror wrote a letter to the trial judge about a month after Sheeran's conviction. In the letter, the juror complained she had been pressured by other jurors into making a decision and prevented from sending a note to the trial judge.[46]

First, the Supreme Court defined extraneous or extrinsic influences since those are ones which are subject to juror examination under D.R.E. 606(b):

(1) exposure of jurors to news items about matters pending before the jury,

(2) consideration by the jury of extra record facts about the case,

(3) communications between third parties and jurors relevant to the case to be decided, and

(4) pressures or partiality on the part of

---

41. 514 A.2d 402 (Del.1986).

42. *Id.* at 404.

43. *Id.* at 404.

44. *Massey v. State*, 541 A.2d 1254, 1259 (Del. 1988).

45. 526 A.2d 886 (Del.1987).

46. The Supreme Court noted that the juror had consented to the verdict when the jury was polled. *Id.* at 897.

the court.[47]

Second, the *Sheeran* court said the matters which this juror recited in her post-verdict letter are intrinsic and a mental process inquiry into which is not permitted.[48] The court noted that a trial judge "has a very broad discretion in deciding whether a case must be retried or the jury summoned and investigated due to alleged exposure to prejudicial information or improper <u>outside influence</u> (emphasis in original)."[49]

The court further said:

During the course of jury deliberations there are numerous pressures which are brought to bear upon the jurors, particularly those who find themselves in a minority position. It is unthinkable that such pressures would not exist, and they undoubtedly multiply as the size of the minority diminishes. One would expect that those in the majority would argue forcefully in an attempt to persuade those in the minority to accept the views of the majority. However, it is generally held that jurors may not impeach their verdict by testimony that it resulted from coercion or majority vote. (citations omitted)[50]

The trials in these cases occurred prior to 1985 although some of the Supreme Court decisions were later. That year is important because DR 7–108 was repealed and replaced with two new Rules of Professional Conduct which provided:

Rule 3.5. Impartiality and decorum of the tribunal

A lawyer shall not:

\*      \*      \*      \*      \*      \*

(b) communicate ex parte with such a person except as permitted by law.

\*      \*      \*      \*      \*      \*

Rule 3.10. Communication with or investigation of jurors.

(a) Before the trial of a case a lawyer connected therewith shall not communicate with or cause another to communicate with anyone he knows to be a member of the venire from which the jury will be selected for the trial of the case.

(b) During the trial of a case:

(1) A lawyer connected herewith shall not communicate with or cause another to communicate with any member of the jury.

(2) A lawyer who is not connected therewith shall not communicate with or cause another to communicate with a juror concerning the case.

(c) Rule 3.10(a) and (b) do not prohibit a lawyer from communicating with veniremen or jurors in the course of official proceedings.

(d) After discharge of the jury from further consideration of a case with which the lawyer was connected, a lawyer shall not ask questions of or make comments to a member of that jury.

(e) A lawyer shall not conduct or cause, by financial support or otherwise, another to conduct a vexatious or harassing investigation of either of venireman or a juror.

(f) All restrictions imposed by Rule 3.10 upon a lawyer also apply to communi-

---

**47.** *Id.* at 895, citing *Government of Virgin Islands v. Gereau*, 523 F.2d 140, 150 (3rd Cir.1975), *cert. denied Gereau v. Government of Virgin Islands*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976).

**48.** *Id.* at 897.

**49.** *Id.*

**50.** *Id.* at 896.

cations with or investigations of members of the family of a veniremen or a juror.

(g) A lawyer shall reveal promptly to the court improper conduct by a veniremen or a juror, or by another toward a venireman or a juror or a member of his family, of which the lawyer has knowledge. (Added, effective June 13, 1989.)

The 1985 version of Rule 3.5(b) uses the same language as Hawaii's Rule 3.5 which *Rapp* held violated the First Amendment. But between 1985 and 2003 when Rule 3.5 was further amended to its current version, the Delaware Supreme Court continued to rely upon D.R.E. 606(b) to enable examination of jurors post-verdict, again, albeit under judicial supervision.

For example, D.R.E. 606(b) was invoked in *Flonnory v. State.*[51] That case is a mixture of juror examination during a trial and post-verdict. Both facets are relevant to this case. During the trial, the court learned that a third party (later determined to be a juror in another case) had told Juror # 6 during the trial that Flonnory had been incarcerated while a juvenile and had killed more than two people. This same third person had also approached two other jurors, but told neither, apparently, what she had said to # 6. The trial judge interviewed all three jurors, and despite learning what Juror # 6 had been told, did not dismiss her since the juror said the information would not affect her impartiality.

But, after the guilty verdict of first degree murder was returned and before the penalty phase began, Juror # 12 reported to the trial judge about what had happened before. The judge conducted a hearing on that report. Juror # 12 confirmed that Juror # 6 had told other jurors of Flonnory's alleged record. Juror # 12 relayed other extraneous information jurors had had, such as gun possession at age nine. Juror # 12 said all this extraneous information had affected her vote. The trial judge also learned jurors may have violated their instructions not to read newspaper coverage of the trial. Since portions of that coverage reported Flonnory's criminal history, this violation was of concern too. The Supreme Court said it warranted an independent inquiry of the jurors to determine if the case could or should proceed to the penalty phase.[52]

The court in *Flonnory* reviewed the key difference between extraneous information going to a jury and intrinsic influences on jurors.[53] The information about Flonnory's record made known to one or more jurors falls within the extraneous category and is subject to examination under D.R.E. 606(b).[54]

It is important to repeat that then Rule 3.5(b) prohibited *ex parte* counsel communication with jurors except as permitted by law. There was no issue in *Flonnory*, however, about *ex parte* contact. All of the inquiries were made in a courtroom. It is the reference to D.R.E. 606(b) that is key for purposes of this opinion.

Like the saga of Robert Hughes discussed earlier, there is also the saga of Bruce Banther. Banther had been convicted of first degree murder. On appeal, among the errors claimed, was that the forelady had been subjected to improper influences and was not competent to serve. Specifically, there were mental health issues and possible cocaine use during the

**51.** 778 A.2d 1044 (Del.2001).

**52.** *Id.* at 1050.

**53.** *Id.* at 1054.

**54.** *Id.*

trial, and that while serving as a juror, she was under investigation for embezzlement.

Before reaching its ultimate decision covering all appealed issues, the Supreme Court remanded the case for expansion of the record relating to the forelady. In the first remand, the Supreme Court wanted an expanded record on the forelady's mental capacity to serve. In response, the trial judge conducted an *in camera* examination of the juror and determined she was capable of being a juror. That determination was appealed.

The appeal resulted in another remand.[55] Banther claimed that the forelady had not correctly answered an original voir dire question about being a victim of a violent crime. The first remand hearing had not covered that issue and a second remand was ordered to further explore it.[56] There was a third remand order but it is unpublished. It is, however, referenced in the Superior Court's remand opinion:

> The present remand was made on August 27, 2002 with three directions. First, the Court was directed to grant Banther's request for funds to hire an investigator to interview third parties and to obtain documentary evidence regarding whether the forelady was the victim of a prior violent crime. Second, the Court was directed to grant Banther's request for funds to hire a mental health expert to render an opinion about the forelady's competence to serve as a juror. The order of remand said that Banther's attorneys should promptly make the results of these investigations known to the Court and the State and file any application for supplemental proceedings with this Court. Third, the

Court was directed to make further findings of fact and conclusions of law on both issues.[57]

The record after the last remand consisted of a history of the forelady's extensive mental health history and a report from a defense-hired psychiatrist indicating there were significant issues of her mental status at the trial. The allegations of cocaine use could not be substantiated for various evidentiary reasons. Ultimately, the Supreme Court found that the forelady's history of being a rape victim meant she did not truthfully answer the voir dire question asking if she were a victim of a violent crime.[58] If she had, the Supreme Court said she should have been excused for cause.[59] The import of this conclusion is that a new trial was ordered.

For purposes of the issues raised in Cabrera's current motion, *Banther* re-confirms important principles: (1) the right to a fair trial and impartial jury, (2) jurors can be examined post-verdict—but not about intrinsic influences, (3) there was no professional conduct bar preventing the defense from doing some investigation, but under Court direction. Still it must be noted, there was no direct or indirect out-of-court contact (as far as is known from any of the *Banther* opinions) between any counsel and the forelady. Questioning of her was by a judge.

*Banther* demonstrates that with an appropriate showing there is no impediment to judicially supervised communication between counsel and jurors. To state it differently, as written in 1985–2003, Rule 3.5(b)s "except as provided by law" includ-

**55.** *Banther v. State*, 783 A.2d 1287 (Del.2001).

**56.** *Id.* at 1292.

**57.** *State v. Banther*, 2002 WL 32071689 (Del.Super.).

**58.** *Banther v. State*, 823 A.2d 467, 484 (Del. 2003).

**59.** *Id.* at 483–84.

ed Supreme Court jurisprudence and, by the courts's repeated reference to it, D.R.E. 606(b) was inferentially meant to be, in part, what that phrase meant. This is so even though there has not been a Supreme Court *opinion* citing both in the same opinion, let alone any other linkage. The only linkage, if you will, of D.R.E. 606(b) to any disciplinary rule is in the *Hughes* remand order.[60]

Whether the professional conduct rule was DR 7–108 or the former 3.5(b), they have never been used to impede post-trial examination of jurors concerning potentially prejudicial extraneous influences. Though the *Hughes* remand order is the only Supreme Court pronouncement in a trial setting where a conduct rule is cited,[61] no conduct rule has ever been invoked, or used, to this Court's knowledge, to prevent counsel from questioning jurors in a judicial setting. Usually, however, the actual questioning is done by the judge only. Counsels' input into the questions or any follow-up questions is sought. In short, these rules have not been used to or resulted in a deprivation of a criminal defendant's right to a fair trial and an impartial jury.

■ The Delaware Supreme Court has since 1980 invoked D.R.E. 606(b) as a basis to allow post-trial judicially conducted or supervised examination of jurors. It did so when DR 7–108 had no "escape clause." It invoked D.R.E. 606(b) when Rules 3.5(b) and 3.10 were written as they were. Even though it never explicitly said so, Rule 3.5(b)'s "except as provided by law" included the "law" as set out in the precedents reviewed above. That "law" included D.R.E. 606(b). That evidentiary rule is the only rule known regulating examination of jurors. It is a court rule of evidence. This Court holds, therefore, that the phrase "except as provided by court rule" in Rule 3.5(c) encompasses, at a minimum, D.R.E. 606(b) and its interpretations by the Supreme Court. What else may be included within that phrase will have to wait another day.

Therefore Rule 3.5(c) operates to preserve Cabrera's right to a fair trial and an impartial jury as secured by the Sixth Amendment and Article I, § 7 of the Delaware Constitution.

### B

■ Cabrera's attack on Rule 3.5(c) also includes an argument that this Rule, by acting as an improper prior restraint, violates his right to free speech as guaranteed by the U.S. and Delaware constitutions. That right, of course, while broad, deep and jealously protected is, nevertheless, not absolute. Several opinions emphatically state why there cannot be out-of-court post-verdict contact with jurors.

> We start with the proposition that henceforth this Circuit prohibits the post-verdict interview of jurors by counsel, litigants or their agents except under the supervision of the district court, and then only in such extraordinary situations as are deemed appropriate. Permitting the unbridled interviewing of jurors could easily lead to their harassment, to the exploitation of their thought processes, and to diminished confidence in jury verdicts, as well as to unbalanced trial results depending unduly on the relative resources of the parties. Such outcomes, or even the appearance of the same, we are not willing to tolerate. Thus, future incidents like the one described above will not be countenanced. (U.S. Attorney *ex parte* questioned juror from first trial where

---

**60.** *Supra* fn. 40.

**61.** Supra fn. 40.

jury had been hung to find out why), (citations omitted).[62]

\*    \*    \*    \*    \*    \*

The right to use juror evidence necessarily implies a method to gather that evidence. We think the jury system is best protected by a rule requiring that any post-verdict interviews of jurors by counsel, litigants, or their agents take place under the supervision and direction of the judge. We decline to permit unrestricted post-trial interviews, as we think such a practice would defeat the important interests protected by restrictions on the use of juror testimony to impeach verdicts. Moreover, permitting unbridled interviews of jurors could lead to harassment of jurors, exploitation of jurors' thought processes, and diminished confidence in jury verdicts. (Citations omitted).

\*    \*    \*    \*    \*    \*

A rule requiring post-verdict interviews to be supervised and directed by the judge also prevents the interrogation from exceeding its proper scope. Further, court supervision and direction prevents arguments and suggestions addressed to the juror's sympathies, or calculated to play on possible resentments against fellow jurors.

\*    \*    \*    \*    \*    \*

The freedom and independence of jury deliberations are best protected by court supervision and direction of post-verdict interviews. The judge may make such order as he deems appropriate for the administration of justice. He may decide to deny the request, or he may decide to question the jurors himself, allowing counsel for both parties to submit proposed questions and to object to any question he intends to ask. (Citations omitted).

\*    \*    \*    \*    \*    \*

Post-verdict interview should be initiated only if the court finds some suggestion that there were extraneous matters in the jury's deliberations. If counsel or litigants without solicitation obtain information suggesting that "extraneous matters" were brought into the jury deliberations, counsel may investigate to determine whether there is matter requiring the attention of the judge. If counsel thinks it warranted, counsel should bring the information to the judge by affidavit, if possible. The judge may then decide what, if anything, should be done in light of the submission. Counsel, litigants and the courts should remember that, "(h)istorically, interrogations of jurors have not been favored by federal courts except where there is some Showing of illegal or prejudicial intrusion into the jury process."[63]

The Eleventh Circuit has addressed the balance between First and Sixth Amendment rights. It first did so in the context of restraints a trial judge placed on pretrial publicity in General Manuel Noriega's trial. The Eleventh Circuit said how cherished were these rights, but there had to be a balancing test. Despite the deep-rooted right of free speech, the Sixth Amendment right to a fair trial prevails.[64]

In the *United States v. Griek*,[65] the issue came up again before the Eleventh Circuit

---

**62.** *United States v. Kepreos*, 759 F.2d 961, 967 (1st Cir.1985).

**63.** *Commonwealth v. Fidler*, 377 Mass. 192, 385 N.E.2d 513, 519, 520 (1979).

**64.** *United States v. Noriega*, 917 F.2d 1543 (11th Cir.1990).

**65.** 920 F.2d 840, 842 (11th Cir.1991).

in the context of post-verdict contact of counsel and jurors. The Southern District of Florida had its own rule regarding such contact which really was F.R.E. 606(b).[66] The court in *Griek* noted again the competing interests; this time the interest being the right of free speech and the public policy of preserving privacy of a jury's deliberations. It found Rule 606(b) protected a criminal defendant's right to be tried by a jury not exposed to outside influences while protecting the compelling interest of not otherwise exposing jury deliberations to public view.[67]

In reaching that result, the 11th Circuit quoted *McDonald v. Pless:*[68]

The Rule is based upon controlling considerations of a public policy which in these cases chooses the lesser of two evils. When the affidavit of a juror, as to the misconduct of himself or the other members of the jury, is made the basis of a motion for a new trial the Court must choose between redressing the injury of the private litigant and inflicting public injury which would result if jurors were permitted to testify as to what had happened in the jury room.

These two conflicting considerations are illustrated in the present case. If the facts were as stated in the affidavit, the jury adopted an arbitrary and unjust method in arriving at their verdict, and the defendant ought to have had relief, if the facts could have been proved by witnesses who were competent to testify to a proceeding to set aside the verdict. But let it once be established that verdicts solemnly made and publicly returned into court can be attached and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might be invalidate the finding. Jurors would be harassed and be set by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference.[69]

*Rapp* again stands alone. Perhaps that is due in part to how Rule 3.5 was interpreted in Hawaii. No other case has adopted its reasoning for finding a First Amendment infirmity in rules of professional conduct relating to juror contact.

All of the reasons cited for finding no such violation apply to Delaware's Rule 3.5(c). The law protecting the sanctity of jury deliberations from examination relating to intrinsic versus extrinsic influences is long-standing. Cabrera's request to conduct judicially unsupervised *ex parte* interviews of jurors brings out every concern and fear every court but *Rapp* has had with such contact, including by inference our Supreme Court by virtue of its remand language in *Hughes*.

The court in *Rapp* focused more on the "except as provided by law" phrase than the bar to *ex parte* contact. But every other court has focused more on the need for judicially controlled post-trial communication and the need to preserve it. In

66. *Id.* at 842.

67. *Id.* at 843.

68. 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915).

69. 238 U.S. at 267, 35 S.Ct. at 784, 59 L.Ed at 1302.

*United States v. Kepreos*,[70] the First Circuit went so far as to prospectively impose the constraints of Massachusetts Conduct Rule DR 7–108 (identical to Delaware's former rule) on U.S. Attorneys practicing in federal courts in the Commonwealth when previously the rule applied only to lawyers appearing in state courts.[71] In *Kepreos*, an Assistant U.S. Attorney had spoken ex parte to a juror in the first trial to find out why it was hung so as to help him in the retrial.

Cabrera's constitutional challenges to Professional Conduct Rules 3.5(c) are **DENIED.**

## II

### A

The Delaware Supreme Court's decisions address more the showing a defendant must make to be granted a new trial when a jury (or juror or jurors) has (or have) been exposed to extraneous information. *Flonnory* is the latest recitation of what it is:

> As a general rule, when a defendant seeks to impeach a verdict for alleged juror misconduct, the defendant has the burden of establishing both the improper influence and actual prejudice to the impartiality of the juror's deliberations.
>
> \*  \*  \*  \*  \*  \*
>
> If a defendant can prove a reasonable probability of juror taint, due to egregious circumstances, that are inherently prejudicial, it will give rise to a pre-

sumption of prejudice and the defendant will not have to prove actual prejudice.[72]

In none of the decisions has our Supreme Court explicitly enunciated the threshold a defendant must meet to get an evidentiary hearing. But common sense shows what that threshold is: good cause. The words do not appear in remand orders, Supreme Court opinions, Rule 3.5(c) or D.R.E. 606(b). Good cause is obviously not as heavy a showing as is needed to show juror prejudice warranting either a mistrial or new trial.[73]

### B

■ There are two issues remaining with Cabrera's request. One, is part of what he seeks to examine an effort to probe for intrinsic influences? The other is whether he has made a good cause showing to explore under judicial auspices in a courtroom proceeding possible extraneous influences.

The notes from Juror #5 and the Court's colloquies with her revealed issues of intrinsic information. The record involving the juror relate to her mental processes and internal pressures. What Juror #5 relayed in her notes is precisely what the Supreme Court confronted in *Sheeran v. State*. A juror complained about pressure on her to make a decision and even prevented her from sending a note to the trial judge. The latter complaint was *not* the case with Juror #5. She sent four notes altogether. As the Supreme Court said, there are "numerous pressures" during deliberations, especially for persons holding a minority position.[74]

---

**70.** 759 F.2d 961 (1st Cir.1985).

**71.** *Id.* at 968, fn. 5.

**72.** *Flonnory v. State*, 778 A.2d at 1054.

**73.** Coincidentally, this Court has had two post-trial hearings in *State v. Reyes*, Cabrera's co-defendant. There were concerns, proved

to be unfounded, that the jury had been given items to use in its deliberations which were not trial exhibits. One hearing involved questioning a juror.

**74.** *Sheeran*, 526 A.2d at 896; *Flonnory*, 778 A.2d at 1056.

But exploring this juror's mental process was forbidden by case law and D.R.E. 606(b).[75]

These same considerations govern here. D.R.E. 606(b) prohibits exploration of Juror # 5's thought process. There is no need and cannot be a basis for even a judicially conducted or supervised examination in a courtroom setting.

Juror # 8's "Mrs. Cabrera looks familiar" is a possible extraneous influence potentially subject to further exploration. But none is needed. The juror's possible recognition of Mrs. Cabrera was vague and uncertain at best. The issue was thoroughly explored at the time. There is no need for developing the record any further.

Juror # 9's report that a juror had said "He's guilty" is the kind of improper influence that also could be potentially reviewed post-verdict had it not been thoroughly explored during the trial. With the continuing input of all counsel and even the defendant, this matter was thoroughly examined and considered during the trial. The record reviewed earlier in detail,[76] show that. Not included in the record cited, however, was that the Court and counsel were especially mindful of possibly crossing a line into intimidation of Juror # 9. All had *McCloskey v. State*[77] in mind and referred to it by name in their discussions.

In *McCloskey*, during deliberations, the forelady asked to see the judge *in camera.* The judge and counsel met with her. She complained about an allegedly uncommunicative juror, # 4. The forelady said that juror wanted to meet with the judge. The judge and counsel met with the juror the next day. She explained she had trouble understanding the instructions, and that other jurors were upset with her about this. The judge asked her to write out any questions she had and give them to the forelady to give to him. The judge announced to counsel, after finishing with juror # 4, he would speak to the jury in the courtroom about some of what was happening. Defense counsel was concerned about possible intimidation of juror # 4 if the judge did so.

The judge, however, addressed the whole jury in the courtroom but only asked if there were more questions. Nothing was said about the earlier one-on-one interviews. There were no questions, but later, the forelady asked meet with the judge again. He did the next day, and she again complained about juror # 4. She also mentioned the hostility among jurors toward that juror.

McCloskey moved for a mistrial claiming juror animosity and intimidation of juror # 4 and that judicial involvement had raised the risk of a denial of a fair trial. The trial judge denied the motion. But the Supreme Court reversed, finding the forelady's conduct was not exemplary, and played a large role, in which the trial judge became enmeshed, in the "reasonable probability of the unlawful intimidation of juror # 4 sufficient to raise a presumption of prejudice." [78]

The *McCloskey* situation illustrates the potential pitfalls of questioning jurors during deliberations as was done with Juror # 5 in this case. But the Court's handling with counsels' guidance, of the issues involving Juror # 5 do not compare to the interplay of the forelady, Juror # 4, the judge and the other jurors in *McCloskey*.

**75.** *Sheeran,* at 897.

**76.** *Supra.,* at pp. 150–161.

**77.** 457 A.2d 332 (Del.1983).

**78.** *Id.* at 338.

The Court and all involved in this case were aware and mindful of the *McCloskey* case and the potential for intimidation. That is why the situation was handled as it was. Further, there was no motion for a mistrial in this case nor a basis for it as in *McCloskey*.

What *McCloskey* means for this case, however, is that without presenting anything new since the trial, the 2001 record does not support a basis for farther examination of jurors, *ex parte* or otherwise. Cabrera's showing such as it is, falls far short of the mark of good cause.

And it does also with juror # 8's report of overhearing a remark of Cabrera's guilt. The remark was not like the knowledge of a juror in a retrial of the defendant's prior *conviction* for which he was being retried. In *Hughes v. State*,[79] the Court found this to be an egregious circumstance which is inherently prejudicial resulting in a reversal.

Juror # 8 did not utter the remark and said she would not be influenced. Careful questioning uncovered no one else who made it or overheard it.

If anything the record shows that the "He's guilty" remark was "lose talk" such as happened in *Styler v. State*.[80] This Court found that Juror # 9's report was credible. It made sure it would not influence her thinking. No other juror reported hearing it when individually questioned. Even after further informed of what the individual questioning was all about and a

further statement to the jury,[81] and secret ballots, the Court was satisfied no improper extraneous influence or pre-judgment was present.

The Court remains satisfied that the record needs no further exploration or expansion. If further examination were undertaken and even though not in a trial setting, there is a legitimate concern of harassment and even creating a public atmosphere of unwillingness to serve; especially in capital cases. The Court is most mindful, of course, that a defendant *must* have an impartial jury free of extraneous influences.

Cabrera has, unlike the cases cited earlier, offered no new information. He relies solely on the 2001 trial record for his application to examine each juror *ex parte*. He has not made a sufficient, if any, showing of a reason or good cause to have a judicially undertaken or supervised follow-up to that 2001 record.

### Conclusion

For the reasons stated herein, defendant Luis Cabrera's motion for leave to permit his counsel to contact the jurors in his 2001 trial is **DENIED**.

---

**79.**   490 A.2d 1034 (Del.1985).

**80.**   417 A.2d 948 (Del.1980).

**81.**   *Supra.*, pp. 152–153.